930 F.2d 204
 Marshall RATTNER, Marshall Rattner Inc., National Limousine
Service, Inc., and Professional Indemnity Agency,
Plaintiffs-Appellants,
v.
Malcolm NETBURN, John B. Farrington, and The Incorporated
Village of Pleasantville, Defendants-Appellees.
 No. 178, Docket 90-7317.
 United States Court of Appeals,
Second Circuit.
 Argued Oct. 1, 1990.
Decided April 9, 1991.
 
 John J. Walsh, New York City (Cadwalader, Wickersham & Taft, David R. Kittay, David L. Noonan, Michelle G. Glassberg, Liddell, Sapp, Zivley, Hill & LaBoon, New York City, on the brief), for plaintiffs-appellants.
 Herbert Teitelbaum, New York City (Richard J. Hiller, Roger Juan Maldonado, Teitelbaum, Hiller, Rodman, Paden & Hibsher, New York City, on the brief), for defendant-appellee Netburn.
 Arthur M. Handler, New York City (Robert S. Goodman, Cheryl Spinner, Whitman & Ransom, New York City, on the brief), for defendants-appellees Farrington and the Incorporated Village of Pleasantville.
 Before FEINBERG, VAN GRAAFEILAND, and KEARSE, Circuit Judges.
 KEARSE, Circuit Judge:
 
 
 1
 Plaintiffs Marshall Rattner et al. appeal from a final judgment of the United States District Court for the Southern District of New York, Gerard L. Goettel, Judge, dismissing their complaint against defendants The Incorporated Village of Pleasantville ("Village"), John B. Farrington, its Mayor ("Mayor"), and Malcolm Netburn, a Village Trustee, seeking damages principally under 42 U.S.C. Sec. 1983 (1988) for violation of plaintiffs' rights of freedom of speech and freedom of association as guaranteed by the First and Fourteenth Amendments to the Constitution, and seeking damages under state tort law. The district court granted summary judgment dismissing the complaint, ruling principally that Rattner had failed to make an adequate showing that his constitutional rights had been infringed. See 733 F.Supp. 162 (1990). The court also dismissed plaintiffs' state-law claims against the Village and the Mayor for failure to file timely notice of claims against those defendants as required by state law, and it declined to exercise pendent jurisdiction over the state-law claims asserted against Netburn. On appeal, plaintiffs contend principally that the district court improperly granted summary judgment against them because it failed to draw all reasonable inferences in their favor as the nonmoving parties. For the reasons below, we affirm in part; but we vacate the dismissal of plaintiffs' freedom-of-speech claim and certain other claims dismissed as a result of that dismissal, and we remand for further proceedings with respect to those claims.
 
 I. BACKGROUND
 
 2
 Rattner is a businessman operating in Pleasantville, New York. The other plaintiffs are Rattner's businesses. Since the interests of Rattner and his businesses are pantographic, we refer hereafter only to Rattner.
 
 
 3
 As indicated in the opinion of the district court, see 733 F.Supp. at 163 & n. 1, Rattner has engaged in lengthy and repeated litigation with the Village concerning, inter alia, zoning disputes with respect to the use of his property in Pleasantville and his claims of official harassment and selective enforcement of local laws against him, his businesses, and his employees. See also Rattner v. Board of Trustees of the Village of Pleasantville, 611 F.Supp. 648 (S.D.N.Y.1985). Viewed in the light most favorable to Rattner, the events leading to the present lawsuit were as follows.
 
 A. The Events
 
 4
 At all pertinent times Rattner has been a member of the Pleasantville Chamber of Commerce ("Chamber"). Until May 1988, the Chamber published a periodic newspaper, the Pleasantville Gazette ("Gazette"). In early 1988, Rattner placed an advertisement in the February 11, 1988 edition of the Gazette, formatted as an interview with Rattner. The ad, entitled "Where Are Your Tax Dollars Going? For Litigation?," gave a description of the history and expense of the ongoing Rattner-Village legal disputes and charged the Village with hiding the cost of the Rattner litigation from the taxpayers through manipulation of budget entries. In addition, on the front page of that issue, the Chamber published the results of a questionnaire it had circulated, which included a question as to the amount of money the Village was spending on litigation, and the response to which revealed local dissatisfaction with that expense.
 
 
 5
 The Rattner advertisement caused a certain amount of discussion among the Village's Trustees and resulted in, inter alia, complaints by Village Administrator John St. Leger, Netburn, and others to Chamber members about the decision to publish the advertisement; and, most importantly, a letter from Netburn to each of the directors of the Chamber other than Rattner. The Netburn letter, dated February 16, 1988, and written on Netburn's personal stationery, is the principal focus of this litigation. It read as follows:
 
 
 6
 Dear [Chamber Director]:Myself and my neighbors wish to express our concern about the negative and political nature of the Pleasantville Gazette.
 
 
 7
 First, we were surprised by the anonymous back-page paid article, which appeared to be a Gazette reporter's interview with Mr. Rattner. This "article" directly attacks the intentions and purposes of the Village as a whole, and its volunteer citizens who have tried to do what is right for our community. It involves The Chamber of Commerce in a difficult, ongoing legal situation.
 
 
 8
 We believe that its inclusion in a Chamber paper was and is inappropriate and a disservice to those of us who live here and have been strong supporters of our local businesses.
 
 
 9
 Secondly, several of the questions on your Page 1 questionnaire results are highly political and misleading in nature. On-site parking did not result in the construction of the building on Tompkins and Bedford Roads.
 
 
 10
 The question on legal fees is also biased and misleading. It is a leading question clearly asked to achieve a certain answer, not to establish objective facts.
 
 
 11
 It appears that The Chamber of Commerce has crossed the line between being a supportive, nonpartisan, and nonpolitical local organization to one that has a political agenda and purpose. In that regard, I would appreciate hearing from you on the following questions:
 
 
 12
 1. Was the decision to run the paid, anonymous "article"--one that attacks our village--made by the entire membership of the organization?
 
 
 13
 2. Can we have a list of those members who supported the inclusion of this "article"?
 
 
 14
 3. Does The Chamber of Commerce have a political purpose? If so, what is that purpose?
 
 
 15
 4. Was the questionnaire reviewed and approved by the entire membership?
 
 
 16
 5. Who wrote the actual questions?
 
 
 17
 6. Are officially constituted members of The Chamber using their office to influence and/or support local political activities?
 
 
 18
 I believe that each citizen of Pleasantville deserves and expects answers to these questions. The healthy growth of many local businesses depends on the trust and honesty displayed by our local businesses and merchants to the Village as a whole. I believe--and many of my neighbors believe--that the recent Gazette raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends.
 
 
 19
 I would appreciate a reply at your earliest convenience.
 
 
 20
 Netburn dictated the letter to his secretary by telephone on February 16 and then immediately called the Village Hall. Shortly thereafter, St. Leger made brief calls from Village Hall to the Village's outside counsel and to the Mayor. The Netburn letters were mailed to the Chamber directors that day.
 
 
 21
 Some three weeks later, at a debate among candidates for Village Trustee, Netburn was questioned about the letter. In response he acknowledged writing the letter, read it aloud, and stated that he had made a list of approximately 40 local businesses at which he regularly shopped.
 
 
 22
 The Netburn statements caused considerable consternation among Chamber members, who knew that Netburn was the Mayor's "right-hand man." In depositions taken in the present action, a number of Chamber directors testified that they regarded the letter, and Netburn's statement that he had made a list, as clearly threatening boycott or other retaliatory action by the Village, including discriminatorily strict enforcement of parking and zoning regulations.
 
 
 23
 As a result, the Chamber took two steps. First, it decided to discontinue publishing the Gazette. It eventually created a new paper that would operate independently of the Chamber in order to insulate each entity from liability for the actions of the other. Second, though one last issue of the Gazette would be published in May 1988 and Rattner had already paid for advertising space in the next two Gazette issues, the Chamber told Rattner it had ceased to publish the Gazette and concealed from him the fact that there would be a May issue, thereby preventing him from including material in that issue.
 
 
 24
 The new newspaper created by the Chamber, the Pleasantville Chronicle ("Chronicle "), began publication in November 1988. The Chronicle has run both commercial advertisements by Rattner's businesses and news stories about the Village-Rattner litigation.
 
 B. The Present Lawsuit
 
 25
 In March 1988, shortly after the Chamber had decided to close the Gazette and create an independent paper, Rattner commenced the present action against Netburn in state court, from whence it was removed to the district court. As eventually amended, the complaint named the Village and the Mayor as well. Attributing the Netburn letter to all of the defendants, the complaint alleged that defendants' actions (1) violated Rattner's right to freedom of speech by (a) causing the Gazette to refuse publication of his views on public issues, and (b) causing the closing of the Gazette as an outlet for the expression of his views; (2) violated his right to freedom of association by causing the Chamber to cease holding its meetings in his office and causing Chamber members to shun him; (3) violated his right to substantive due process by its pattern of actions seeking to suppress his speech; and (4) violated his right to equal protection. The complaint also asserted state-law claims of, inter alia, prima facie tort and tortious interference with business relationships.
 
 
 26
 Following extensive discovery, the Village and the Mayor moved for summary judgment dismissing the constitutional claims on the grounds, inter alia, that Rattner had failed to show that Netburn's letter was attributable to them or constituted state action; they sought dismissal of Rattner's state-law claims on the ground that Rattner had failed to serve them with a notice of claim as required by N.Y. Gen.Mun.Law Sec. 50-e (McKinney 1986). All of the defendants moved for summary judgment dismissing Rattner's constitutional claims on the grounds (a) that they could not be held liable for Netburn's exercise of his own First Amendment right to free speech in sending the letter, (b) that Rattner had failed to show any constitutional violation, and (c) that in any event, the Mayor and Netburn had qualified immunity with respect to the sending of the Netburn letter.
 
 
 27
 In its opinion reported at 733 F.Supp. 162, the district court granted summary judgment dismissing the complaint on the ground that Rattner had not shown a violation of any of his constitutional rights. As discussed in greater detail in Part II.A. below, the court found that Rattner had no valid freedom-of-speech claim because the Netburn letter was not a threat of boycott but merely a plea that the Chamber should rid itself of political affiliations. It also ruled that because the Gazette could not be forced to publish Rattner's material, its failure to accept his material because it ceased operations as the result of defendants' actions could not have violated Rattner's right to freedom of speech. Further, noting that though Rattner had offered to resign from the Chamber, he had been urged by Chamber members not to do so and had not done so, and concluding that the Chamber's relocation of its meetings was immaterial, the court found no violation of Rattner's freedom of association. The court found that Rattner's due process claim must be dismissed because it was dependent on his First Amendment claim, and that his equal protection claim must be dismissed because it was entirely conclusory.
 
 
 28
 Finding that dismissal of Rattner's constitutional claims was warranted on the above grounds, the court declined to rule on defendants' contentions that Netburn's actions (a) could not be attributed to the Mayor or the Village, (b) were not state action, (c) were protected by qualified immunity, or (d) were the privileged exercise by Netburn of his own First Amendment rights.
 
 
 29
 The court dismissed the state-law claims asserted against the Village and the Mayor on the ground that Rattner had failed to serve them with a notice of claim as required by state law. Finally, having dismissed all federal claims, it declined to exercise pendent jurisdiction over the state-law claims against Netburn.
 
 
 30
 Judgment was entered dismissing the complaint, and this appeal followed.
 
 II. DISCUSSION
 
 31
 On appeal, Rattner contends that he produced sufficient evidence to avoid summary judgment on his freedom-of-speech, freedom-of-association, and due process claims and that the court erred as a matter of law in dismissing his state-law claims against the Mayor and the Village for noncompliance with state notice requirements. He does not pursue his equal protection claim. Though we affirm the dismissal of the freedom-of-association claim and the state-law claims against the Mayor and the Village substantially on the grounds stated by the district court, see 733 F.Supp. at 171-72; id. at 166, we vacate the dismissal of the freedom-of-speech claim, the due process claim, and the state-law claims against Netburn, and we remand for further proceedings on those claims.
 
 
 32
 A. Summary Dismissal of the Freedom-of-Speech Claim
 
 
 33
 "To recover on a first amendment claim under Sec. 1983, a plaintiff must demonstrate that his conduct is deserving of first amendment protection and that the defendants' conduct of harassment was motivated by or substantially caused by his exercise of free speech." Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d 54, 58 (2d Cir.1987). The placement of a political advertisement in a local newspaper comes within the protection of the First Amendment. See, e.g., Boos v. Barry, 485 U.S. 312, 318, 108 S.Ct. 1157, 1162, 99 L.Ed.2d 333 (1988); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 913, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982). Governmental interference with such speech gives rise to a viable claim for violation of First Amendment rights. Hammerhead Enterprises, Inc. v. Brezenoff, 707 F.2d 33, 39 (2d Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). Although an individual has no right to force a private publication to air his political views, see Midwest Video Corp. v. FCC, 571 F.2d 1025, 1054 (8th Cir.1978), aff'd, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979); see also Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974); In re G. & A. Books, Inc., 770 F.2d 288, 299 (2d Cir.1985), cert. denied, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986), a government does not have license to forbid the publication to air those views, cf. Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 68, 83 S.Ct. 631, 638, 9 L.Ed.2d 584 (1963).
 
 
 34
 In Hammerhead Enterprises, Inc. v. Brezenoff ("Hammerhead"), we considered a dispute between the plaintiff toy manufacturer and an agency of the City of New York. The company produced and sold a board game called "Public Assistance--Why Bother Working for a Living," which maligned the nation's welfare system. The City's Administrator of the Human Resources Administration sent a letter to 13 department stores, defending the City's welfare system, deploring the harm the game would do "to taxpayers and welfare clients alike," and closing with the statement that "[y]our cooperation in keeping this game off the shelves of your stores would be a genuine public service." 707 F.2d at 36, 37 n. 2. The company brought suit claiming a violation of its First Amendment rights. The district court, after a bench trial, dismissed the complaint. We affirmed, noting that "the record indicates that Brezenoff's request to New York department stores to refrain from carrying [the game] was nothing more than a well-reasoned and sincere entreaty in support of his own political perspective," and "not a single store was influenced by Brezenoff's correspondence." Id. at 38, 39. We noted, however, that "[w]here comments of a government official can reasonably be interpreted as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim [for violation of First Amendment rights] can be stated." Id. at 39.
 
 
 35
 The party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists and that he is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986); Adickes v. S. H. Kress & Co., 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). The function of the district court in considering the motion for summary judgment is not to resolve disputed issues of fact but only to determine whether there is a genuine issue to be tried. See, e.g., Balderman v. United States Veterans Administration, 870 F.2d 57, 60 (2d Cir.1989); Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d at 58; Heyman v. Commerce & Industry Insurance Co., 524 F.2d 1317, 1319-20 (2d Cir.1975). In assessing the record, including affidavits, exhibits, interrogatory answers, and depositions, to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); Balderman v. United States Veterans Administration, 870 F.2d at 60; Donahue v. Windsor Locks Board of Fire Commissioners, 834 F.2d at 57. If, with respect to a material fact as to which the moving party contends there is no dispute, there is evidence in the record from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper. Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir.1988).
 
 
 36
 In the present case, the record, taken in the light most favorable to Rattner, reveals statements by Netburn that a reasonable factfinder could, in the words of Hammerhead, "interpret[ ] as intimating that some form of punishment or adverse regulatory action w[ould] follow" if the Gazette continued to air Rattner's views. The district court, in concluding that Rattner had no freedom-of-speech claim, stated in part as follows:
 
 
 37
 We do not think Netburn's conduct can be equated to ... [a] "thinly veiled" regulatory scheme. In this action, Netburn had no authority to impose criminal or other sanctions on the Pleasantville Chamber of Commerce. The letters were not followed up with unannounced visits by police personnel. The letter contained none of the indicia of a prosecutorial instrument. Rather, the statements in the letter amounted to a plea to the Chamber of Commerce to rid itself of its political affiliations.
 
 
 38
 ....
 
 
 39
 Although the plaintiff characterizes the letter as threatening a boycott of local businesses, the language of the letter does not support such an interpretation. In the absence of language intimating legal reprisal, the plaintiff's claim of governmental coercion must fall. As stated by Judge Pollack in the initial decision of Hammerhead:
 
 
 40
 A public official does not lose his unfettered right to express his opinion in non-defamatory words concerning the critical comments of zealots and others exercising like privileges by deed or word. The contra would put a silencer on the elected and selected leaders of the body politic. The Brezenoff letter was not censorship; it was an appeal to conscience and decency.
 
 
 41
 Hammerhead Enter. v. Brezenoff, 551 F.Supp. 1360, 1370 (S.D.N.Y.1982), aff'd, 707 F.2d 33 (2d Cir.), cert. denied, 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983). We agree and hold that the plaintiff has failed to establish a deprivation of his freedom of speech.
 
 
 42
 733 F.Supp. at 169-71. This rationale does not view the evidence in the light most favorable to the parties opposing summary judgment, and the reliance on Hammerhead is misplaced.
 
 
 43
 Though the district court characterized the Netburn letter as simply a plea to the Chamber to rid itself of political affiliations, that letter stated that the recent Gazette "raises significant questions and concerns about the objectivity and trust which we are looking for from our business friends," and it asked "[w]ho wrote" the questions and requested "a list of those members who supported the inclusion of this 'article'." Further, the record includes evidence that, when questioned about the letter, Netburn also stated that he had made a list of the local businesses at which he regularly shopped. The district court's ruling that the language of the Netburn letter, either standing alone or in all the circumstances, is not a veiled threat of boycott or reprisal does not view that language in the light most favorable to Rattner as the nonmoving party.
 
 
 44
 The district court's reliance on the Hammerhead district court's characterizations of the letter at issue there as precatory rather than threatening or coercive is misplaced for two reasons. First, the district court in Hammerhead found that the Brezenoff letter had no coercive impact, 551 F.Supp. at 1370 ("if the letter had any impact, it was to increase the opportunities of the plaintiffs to express their views in the media"), and we noted that "not a single store was influenced by Brezenoff's correspondence," 707 F.2d at 39. Here, in contrast, a threat was perceived and its impact was demonstrable. Several Chamber directors testified at their depositions that they viewed the letter as reminiscent of McCarthyism, threatening them with boycott or discriminatory enforcement of Village regulations if they permitted the publication of additional statements by Rattner; the Chamber member who had been "in charge of" the Gazette testified that following receipt of the Netburn letter, he had actually lost business and had been harassed by the Village. Further, the Netburn letter caused the Chamber to cease publication of the Gazette; and it advised Rattner of this decision while concealing from him the fact that another issue would be forthcoming, in order to avoid having to publish in that issue material for which he had already paid. Thus, the fact that Netburn's letter and statement "were not followed up with unannounced visits by police personnel," 733 F.Supp. at 170, should hardly have been deemed dispositive since the Chamber immediately capitulated to what may reasonably be viewed as an implicit threat.
 
 
 45
 More importantly, the Hammerhead case was decided after a bench trial, not on summary judgment. Thus, Judge Pollack made his decision after "weighing the evidence, circumstances and probabilities and assessing the credibility of witnesses." Hammerhead Enterprises, Inc. v. Brezenoff, 551 F.Supp. at 1363. In ruling here on defendants' motion for summary judgment, Judge Goettel was required to draw all inferences in Rattner's favor and was not entitled to weigh the evidence or to assess credibility as if there had been a trial. When those inferences are drawn in favor of Rattner, there are genuine issues of fact to be tried. Summary judgment dismissing this claim was therefore improper.
 
 B. Other Issues
 
 46
 The district court indicated that it was dismissing Rattner's due process claim because it was dependent on his freedom-of-speech claim. Since the freedom-of-speech claim must be reinstated, we also vacate the dismissal of the due process claim. Further, in light of the reinstatement of these federal claims, we vacate the dismissal of the pendent state-law claims against Netburn.
 
 
 47
 Because of its dismissal of the complaint on other grounds, the district court did not decide defendants' contentions, inter alia, that there was no state action, that they are entitled to qualified immunity, and that Netburn was entitled to exercise of his own First Amendment right of free speech. We express no view as to the merits of the contentions not ruled on by the district court.
 
 CONCLUSION
 
 48
 For the above reasons, we affirm the dismissal of plaintiffs' freedom-of-association claims against all defendants and their state-law claims against the Village and the Mayor; we vacate so much of the judgment as dismissed plaintiffs' freedom-of-speech and due process claims against all defendants and their state-law claims against Netburn. We remand for further proceedings not inconsistent with the foregoing.
 
 
 49
 Costs to plaintiffs.
 
 VAN GRAAFEILAND, Circuit Judge, dissenting:
 
 50
 With all due respect to my learned colleagues, I feel compelled to cast my lot with District Judge Goettel. Netburn's letter to the Director of the Chamber of Commerce is quoted in its entirety in the majority opinion. There can be no dispute as to its contents. Like Judge Goettel, I see nothing in the letter that can be construed as a threat of any kind. Judge Goettel described it as "an expression of [Netburn's] frustration and disapproval of the Chamber of Commerce's involvement in the political arena." 733 F.Supp. at 171. Judge Goettel continued, "the Netburn letter threatened no legal action or prosecutorial follow-up," neither did it threaten a boycott of local businesses. Id.
 
 
 51
 Judge Goettel also stated: "The letter contained none of the indicia of a prosecutorial instrument. Rather, the statements in the letter amounted to a plea to the Chamber of Commerce to rid itself of its political affiliations." Id. at 170. Judge Goettel concluded: "In the absence of language intimating legal reprisal, the plaintiff's claim of governmental coercion must fall." Id. at 171.
 
 
 52
 The preliminary question whether the letter was sufficiently ambiguous that a jury might find an implied threat is not, itself, a question of fact; it is a question of law. See Tokio Marine & Fire Ins. Co. v. McDonnell Douglas Corp., 617 F.2d 936, 940 (2d Cir.1980); In re Hartford Textile Corp., 588 F.2d 872, 875 (2d Cir.1978), cert. denied, 444 U.S. 870, 100 S.Ct. 146, 62 L.Ed.2d 95 (1979); Parish v. Howard, 459 F.2d 616, 618-20 (8th Cir.1972); Freeman v. Continental Gin Co., 381 F.2d 459, 465 (5th Cir.1967). The letter is before us. It is either ambiguous, or it is not. If, as I believe, it is not, there is no place for a discussion of alleged factual inferences favoring the plaintiff. See Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 745 n. 11, 103 S.Ct. 2161, 2171 n. 11, 76 L.Ed.2d 277 (1983). The issue is one of law, not of fact. Any other rule would seriously curtail the use of summary judgment in meritless cases involving written documents. See Universal Fiberglass Corp. v. United States, 400 F.2d 926, 929 (8th Cir.1968).
 
 
 53
 In my opinion, Rattner's contention that his constitutional rights were violated by Netburn's letter to the Chamber of Commerce trivializes the beneficent motivations for the enactment of 42 U.S.C. Sec. 1983. His claimed damages are illusory at best. Unfortunately, however, should he be awarded as little as one dollar in damages, he could make a claim under 42 U.S.C. Sec. 1988 for the legal fees of the high-priced Manhattan law firms that he saw fit to bring into this frivolous litigation. See DiFilippo v. Morizio, 759 F.2d 231, 234-35 (2d Cir.1985); Nephew v. City of Aurora, 830 F.2d 1547 (10th Cir.1987) (en banc), cert. denied, 485 U.S. 976, 108 S.Ct. 1269, 99 L.Ed.2d 481 (1988). These costs actually are what Rattner is seeking. I agree with Judge Goettel that it is time to bring this travesty of justice to a conclusion. I would affirm.