**BRISTOL–MEYERS SQUIBB COMPANY and Mead Johnson & Company, Plaintiffs,**

v.

**DANBURY PHARMACAL, INC., Defendant.**

No. 92 Civ. 6838 (JSM).

United States District Court, S.D. New York.

June 30, 1993.

Brian M. Poissant, John J. Normile, Pennie & Edmonds and Constance S. Huttner, Skadden Arps Slate Meagher & Flom, New York City, for plaintiffs.

Alfred Enbelberg, Greenwich, CT, Kenneth P. George, Amster Rothstein & Ebenstein, New York City, for defendant.

*OPINION AND ORDER*

MARTIN, District Judge:

Plaintiffs Bristol–Meyers Squibb Company and Mead Johnson & Company are suing defendant Danbury Pharmacal, Inc. for pat-

ent infringement. Plaintiffs allege that defendant infringed U.S. Patent No. 4,182,763 (the " '763 patent") when defendant filed an Abbreviated New Drug Application which asserted that the '763 patent was invalid and unenforceable. Defendant now moves for summary judgment on its defense that the '763 patent is invalid due to anticipation under 35 U.S.C. § 102.

The '763 patent was issued on January 8, 1980 and claimed a new use of the drug "buspirone" to treat neurotic anxiety in human patients. Buspirone had previously been developed by plaintiffs and had been patented under two separate patents, U.S. Patent Nos. 3,717,634 (the " '634 patent") and 3,976,776 (the " '776 patent"), which had been applied for in a single application originally filed on November 24, 1969 and which were issued on February 20, 1973 and August 24, 1976 respectively. Defendant claims that the '634 and '776 patents[1] anticipated, or disclosed, the new use sought to be patented in the '763 patent, and that the use in the '763 patent was therefore non-novel and not properly the subject of a patent.

The claims in the '763 patent application were initially rejected by the patent examiner pursuant to 35 U.S.C. § 103 because they were obvious from the '776 and '634 patents, as well as from certain studies which were referenced in those patents. The examiner noted, "Tranquilizers have traditionally been used to treat anxiety conditions. The claimed used [sic] is for an anxiety problem." However, after plaintiffs argued that the examiner had oversimplified the usage of the term "tranquilizers," the claims were allowed.

*Discussion*

Summary judgment is proper when there is no genuine issue of material fact and, based upon facts not in dispute, the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court's role on a motion for summary judgment is not to decide disputed issues of fact but only

to determine whether there is a genuine issue to be tried. *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). Moreover, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Rattner*, 930 F.2d at 209 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)). The validity of a patent, and specifically whether the patent was anticipated, can be the subject of summary judgment when appropriate. *Scripps Clinic & Research Found. v. Genentech, Inc.*, 927 F.2d 1565, 1576 (Fed.Cir.1991).

■ A patent holder is entitled to a presumption of validity, 35 U.S.C. § 282, which may only be defeated by clear and convincing evidence, *Bausch & Lomb, Inc. v. Barnes–Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed.Cir.1986), *cert. denied*, 484 U.S. 823, 108 S.Ct. 85, 98 L.Ed.2d 47 (1987). Moreover, where the patent examiner had the same evidence before him as does the instant court, "the burden on the party asserting invalidity is more difficult to meet." *Hewlett–Packard Co. v. Bausch & Lomb, Inc.*, 909 F.2d 1464, 1467 (Fed.Cir.1990); *Barnes–Hind*, 796 F.2d at 447. Of course, on summary judgment, it must be established that there is no genuine issue of material fact as to the validity of the patent. *See supra.*

■ Anticipation, or prior disclosure of the invention, will prevent a patent from being issued because it renders the invention non-novel. "A party asserting that a patent claim is anticipated under 35 U.S.C. § 102 'must demonstrate, among other things, identity of invention.' " *Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1565 (Fed.Cir.1992) (quoting *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984), *overruled in part on other grounds, SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1125 (Fed.Cir. 1985) (en banc)).

---

1. Both plaintiffs and defendant focus exclusively on the '776 patent, apparently because they agree that the disclosures in the '634 patent were identical. Thus, the Court also will focus exclusively on the '776 patent.

"Invalidity for anticipation requires that all of the elements and limitations of the claim are found within a single prior art reference. There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention." *Scripps,* 927 F.2d at 1576 (citations omitted). Furthermore, the reference disclosure must be evaluated from the standpoint of one of ordinary skill at the time of the disclosure. *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.,* 726 F.2d 724, 726 (Fed.Cir.1984). Where the prior art reference is in a patent, it is not necessary that the reference "teach" the claim sought to be invalidated; "it is only necessary that the claims under attack, as construed by the court, 'read on' something disclosed in the reference, i.e., all limitations of the claim are found in the reference, or 'fully met' by it." *Kalman,* 713 F.2d at 772.

Although "a finding of anticipation requires that all aspects of the claimed invention were already described in a single reference," *Scripps,* 927 F.2d at 1576, "[i]t is sometimes appropriate to consider extrinsic evidence to explain the disclosure of a reference.... The role of extrinsic evidence is to educate the decision maker as to what the reference meant to persons of ordinary skill in the field of the invention, not to fill in gaps in the reference." *Id.; see Studiengesellschaft,* 726 F.2d at 727.

■ The '776 patent summarized the invention as follows:

The present invention relates to azaspirodecanedione and azaspiroundecanedione derivatives as hereinabove described.... In U.S. Pat. No. 3,398,151 reference is also made to derivatives of azaspirodecanediones and azaspiroundecanediones which have a number of pharmacological activities including tranquilizing action. In the instant case, it has been discovered that N-(heteroarcyclic)piperazine alkyl derivatives of azaspirodecanediones and azaspiroundecanediones are highly active and specific tranquilizing agents and in addition also exhibit anti-emetic properties. Present compounds are improved tranquilizing agents compared to azaspirodecanediones and azaspiroundecanediones of U.S. Pat.

No. 3,398,151, in that tranquilizing activity is more potent and specific.

With respect to side effects such as sedative and alpha-adrenergic blockade which are exhibited by a number of prominent tranquilizing agents the present compounds are unique in that such an adverse reaction is substantially diminished or practically nonexistent. By way of illustration, [one of the buspirone compounds] has only about 1/400th. the alpha-adrenergic blocking activity of the well known tranquilizer, chlorpromazine.

Tranquilizing properties of the compounds of this invention can be demonstrated by rats in a shuttle box technique described by J.R. Albert and L.E. Allen in the Pharmacologist 4,152 (1962). This test is designed to differentiate tranquilizing agents from non-specific nervous system depressants such as sedatives and hypnotics. Tranquilizing effects are observed when the compounds of the present invention are administered intraperitoneally to the rat....

The tranquilizing action of the compounds of the present invention can be demonstrated in Rhesus monkeys by observing general behavioral effects. Intramuscular administration of present compounds to monkeys ... affords tranquilizing effects similar to those produced by chlorpromazine.

Based on this summary, the patent claimed "[t]he process for eliciting tranquilizing effect in a mammal which comprises administering systematically· to a mammal in need thereof an effective tranquilizer dose· of" buspirone. Defendant claims that these indications of buspirone as a "tranquilizer" encompassed using buspirone as an anti-neurotic anxiety, or anxiolytic, agent, which use was claimed in the '763 patent.

Plaintiffs argue that the references to buspirone as a "tranquilizer" in the '776 patent refer to its anti-psychotic effect rather than to its anxiolytic effect, and thus the two patents are distinguishable. On this motion for summary judgment, the evidence must be construed in favor of the plaintiffs, and is as follows.

· Due to an on-going evolution in the understanding of treatment of psychoses and anxieties, the words "anxiety" and "tranquilizer" as used in 1969 could have been understood to have had various meanings. A patient could have neurotic anxiety, which might be described in layman's terms as obsessive worrying, or might instead suffer from psychotic anxiety, or psychosis, which would entail wholly delusional fears. Before 1969, neurotic anxiety and psychosis were commonly regarded as two areas on a continuum, with psychosis being the more severe; however, in the early 1970s, it began to be recognized that the two were in fact wholly distinct maladies. In and around 1969, the understanding of the relationship between neurosis and psychosis could best be described as in flux.

In the 1950s, a drug called chlorpromazine, and widely-marketed as "Thorazine," began to be employed in treating patients suffering from anxiety and psychosis. Previously, only sedatives, which produced a "quieting" effect in patients, and hypnotics, which induced sleep, were being used to treat these patients without much success. Chlorpromazine was discovered to dispel the delusions from which psychotic patients suffered, and was initially assumed to be of use in treating neurotic patients as well. By the late 1960s, however, there was a serious question as to whether such anti-psychotic drugs would be of use in treating patients suffering from neurotic anxiety. Nevertheless, the undisputed evidence is that in and around 1969 chlorpromazine was being held out as being effective in treating anxiety, and that many people in the field regarded it as such.

In and around 1969, the term tranquilizer could have referred to sedatives, hypnotics, anti-psychotics, anxiolytics, or any combination thereof. Plaintiff's experts claim that the term "major tranquilizer" was often understood to refer to antipsychotics, while "minor tranquilizer" encompassed the rest, although as the late 1960s approached it began to be recognized that such groupings were unwarranted.

In order to understand the meaning of the relevant excerpts from the '776 patent, it is also necessary to explore some of the references therein. The shuttle-box rat test mentioned in the '776 patent was widely regarded as a means of testing anti-psychotic properties of a drug; positive results in such a test would indicate anti-psychotic potential. The Rhesus monkey studies referred to indicated that buspirone induced catalepsy in monkeys, also a sign of anti-psychotic potential. Both of these tests also indicated that buspirone lacked the sedative effects and alpha-adrenergic blocking activity which were seen as unfortunate side-effects of chlorpromazine and similar compounds.

However, while a person of ordinary skill would have understood the anti-psychotic implications of positive results in a shuttle box test, such a test being common in the field, she would not have been familiar with the particular Rhesus monkey studies referred to in the '776 patent, and so would not have been aware that those studies focused on anti-psychotic effects without indicating anxiolytic potential or lack thereof. Instead, a person of ordinary skill reading the last-quoted paragraph of the '776 patent would only have learned that the Rhesus monkey studies indicated that buspirone had "tranquilizing effects similar to those produced by chlorpromazine."

Thus, the '776 patent clearly described buspirone as a drug with anti-psychotic potential while at the same time lacking qualities of a sedative or hypnotic. The pivotal question is whether the references to buspirone's "tranquilizing effects" would have been understood by one with ordinary skill in the field at the time who was reading the patent without any other materials to be limited solely to anti-psychotic activity or would be read to include anxiolytic effects as well.

There is no genuine issue of material fact that the language used in the '776 patent, which was not specifically limited to anti-psychotic tranquilizing effects, would have been understood to refer to anxiolytic effects as well. The text of the patent speaks throughout of buspirone's "tranquilizing effects," without making any specific distinctions between anxiolytic and anti-psychotic, at a time when the word "tranquilizer" was used to refer to many different types of

effects. However, the patent went to great pains to point out that buspirone did not have tranquilizing effects similar to sedatives and hypnotics, drawing a distinction between those drugs and "tranquilizers," and, by implication, leaving anti-psychotics and anxiolytics in the latter category.

Furthermore, it was well known at the time that chlorpromazine was perceived by many to have anxiolytic effects, although admittedly its primary benefit and use was as an antipsychotic. Certainly the '776 patent did not claim buspirone to be *identical* to chlorpromazine; in fact, the apparent differences between the two regarding sedative and hypnotic effects was exactly what rendered buspirone unique and potentially innovative. But the patent claimed that buspirone had "tranquilizing effects similar to those produced by chlorpromazine", and nothing in the patent implied that buspirone differed from chlorpromazine in any other type of tranquilizing effect, including anxiolytic.

That this was the understanding a person of ordinary skill in the field would have had of the disclosures in the '776 patent is demonstrated by documents filed by plaintiffs with the FDA on February 10, 1972, soon after the '776 patent application was filed and while it was pending.[2] The first paragraph on page two of an "Investigator Brochure" stated, "From laboratory responses it appears that [buspirone] has potential clinical activity in the same areas as [chlorpromazine], *with particular emphasis on its possible use as an antianxiety agent*" (emphasis added). Any doubt that this statement might have referred to psychotic anxiety rather than neurotic anxiety is resolved by a statement two paragraphs later that trials would be conducted with various patients in order "to determine whether or not in addition to possible *antianxiety* activity [buspirone] will also be useful as an *antipsychotic* agent" (emphasis added). Likewise, a Master Study Plan submitted to the FDA stated,

Based on presently available information from laboratory studies in animals [buspirone] has a *chlorpromazine type of action* and, if these observations can be extended to the human, it would be useful in the treatment of *agitation, anxiety and tension*, personality disorders, psychotic conditions including acute and chronic schizophrenia, the manic phase of manic-depressive states and involutional and senile psychoses.

(emphasis added). Thus, it is clear that the "tranquilizing effects" alluded to in the '776 patent included anxiolytic as well as antipsychotic effects.

Plaintiffs filed the '776 patent making broad claims for the tranquilizing effects of this product, no doubt hoping to secure for themselves a broad patent monopoly. Their own 1972 submission to the FDA demonstrates that they considered their invention to cover both anti-anxiety and anti-psychotic properties. In face of this clear evidence that the invention covered exactly what the plain meaning of the language suggests, plaintiffs' submissions of expert affidavits that ask the Court to ignore the plain language of the patent do not create an issue of fact precluding summary judgment.

*Conclusion*

For the foregoing reasons, defendant's motion for summary judgment on its defense of anticipation is GRANTED, and this case is DISMISSED.

SO ORDERED.

---

2.  It should be stressed that the FDA filings are not prior art, and so cannot themselves be considered to have anticipated the use claimed in the '763 patent. Nor can they be employed to expand upon the information disclosed in the '776 patent. Rather, in this motion for summary judgment on the issue of anticipation, their sole use is to educate the Court as to what understanding a person of ordinary skill in the field would have had of the statements in the '776 patent. *See supra.*