In the Matter of the Complaint of MOR-AN ENTERPRISES CORPORATION, Mec I, Inc., Moran Towing and Transportation Co., Inc., Moran Towing Corporation, Petroleum Transport Corporation, and Seaboard Barge Corporation, as Owners or Bareboat Charterers of the Barge TEXAS, for Exoneration from or Limitation of Liability.

In the Matter of the Complaint of Moran Towing Corporation, Moran Atlantic Towing Corporation and Moran Towing and Transportation Co., Inc., as Owners or Bareboat Charterers of the Tug HEIDE MORAN, for Exoneration from or Limitation of Liability.

Nos. 97 CV 2272, 97 CV 1647.

United States District Court,
E.D. New York.

Dec. 17, 1999.

Carmody & Torrance LLP, New Haven, Connecticut, by Joshua L. Milrad, Maureen Cox, of counsel, for the claimant The Connecticut Light And Power Company.

Looney & Grossman LLP, Boston, Massachusetts, by Bertram E. Snyder, of counsel, for the claimant Long Island Lighting Company.

Lyons, Skoufalos, Proios & Flood, New York City, by Kirk M.H. Lyons, of counsel, for the claimant The Connecticut Light And Power Company.

Burlingham Underwood LLP, New York City, by Geoffrey J. Ginos, John Taylor, of counsel, for the Claimant/Third Party Defendant Bayway Refining Company.

Healy & Baillie, LLP, New York City, by John G. Ingram, Richard Singleton, Daniel Carr, of counsel, for the petitioners Moran Towing Corporation.

## MEMORANDUM OF DECISION AND ORDER

SPATT, District Judge.

This motion involves the applicability, if any, of the 1927 Supreme Court decision in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927). While *Robins* is apparently still good law today, this Circuit and many others have grappled with the parameters in which the Supreme Court's holding bars recovery to plaintiffs that have suffered economic damages as a result of a maritime non-intentional tort.

On December 6, 1996, after unloading fuel at the Northport, New York offshore platform of the Long Island Lighting Company ("LILCO"), a barge called "TEXAS" owned by the Petitioner Moran, broke loose from its moorings. When the attending tug, "HEIDE MORAN," also owned by the Petitioner Moran, failed to control TEXAS, the crew of TEXAS dropped its anchor. Both the Connecticut Light & Power Company ("CL & P") and LILCO claim that a system of submarine electrical cables running along the sea bed of the Long Island Sound between CL & P's power plant in Norwalk, Connecticut and LILCO's power plant in Northport, New York were damaged by the anchor of the barge TEXAS.

On April 3, 1997 and April 25, 1997, Moran, owners and bareboat charterers of the barge TEXAS and tug HEIDE MORAN, filed separate "limitation complaint's" seeking Exoneration from or Limitation of Liability provided under 46 U.S.C. §§ 183 *et seq.* Moran's two limitation complaints contest any liability on behalf of the barge TEXAS and the tug HEIDE MORAN for any losses, damages, injuries and destruction incurred as a result of the December 6, 1996 incident.

On June 27, 1997, LILCO and CL & P, owners of seven submarine electrical cables which were allegedly damaged during the accident, filed claims against Moran in both actions seeking damages for repair of the cables. On the same day, LILCO and CL & P filed a Third Party Complaint against Bayway Refining Company ("Bayway"), who sold the fuel oil to LILCO, seeking indemnification under the LILCO/Bayway contract for delivery of fuel which was being transported by the barge TEXAS.

Presently before the Court are Bayway and Moran's motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") seeking dismissal of the claims of CL & P. Bayway and Moran contend that under the Supreme Court's 1927 decision in *Robins Dry Dock and Repair v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), CL & P is not entitled to recover any damages as a result of the occurrence as it has not suffered any direct property damage and due to the fact that it does not have a proprietary interest in the damaged cable.

## I. BACKGROUND

It is important to note at the outset that the facts surrounding the affiliation, if any, between LILCO and CL & P, are essential to the determination of this motion due to the contention by Bayway and Moran that under general maritime tort law, recovery of economic loss is prohibited in the absence of physical harm to the claimant's proprietary interest. In other words, Bayway and Moran argue that because the damage to the cables occurred within the boundaries of Long Island, CL & P is not entitled to recover damages from them as CL & P did not have a proprietary interest in the damaged cables. On the other hand, CL & P submits that the general maritime tort doctrine enunciated in *Robins* does not bar recovery in this particular case because its loss was not purely economic and due to the fact that it has a proprietary interest in the damaged cable. Accordingly, the court will highlight those facts that are relevant to CL & P's ownership and/or proprietary interest in the cables.

The following facts are not at issue unless otherwise stated. On December 6, 1996, in the midst of heavy rain and strong wind, Moran's barge TEXAS broke loose from its moorings after unloading fuel sold by Bayway to LILCO, at LILCO's Northport, New York platform. When the attending tug HEIDE MORAN, failed to control the barge, the crew of the barge TEXAS dropped its anchor in order to maintain its position. It is alleged that the anchor subsequently dragged across and severed or severely damaged all seven of the individual submarine cables that run across the floor of the Long Island Sound. As a result, the cables were completely inoperable from December 6, 1996 to June 27, 1997, threatening a "voltage collapse" in south west Connecticut. As a result, CL & P paid $11,492,000 to repair the cables and $5,072,278 in emergency expenditures to prevent the risk of a voltage collapse in south west Connecticut.

With regard to the affiliation between CL & P and LILCO, on October 31, 1967, the companies entered into a written agreement for construction of the cable. The agreement provided, in relevant part:

I. Construction and Ownership of Cable

**Subject to the provisions of Article VII,** LILCO will own operate and maintain all of the Cable within the State of New York and will bear sole responsibility for any liability arising out of such ownership, operation and maintenance; and CL & P will own, operate and maintain all of the Cable within the State of Connecticut and will bear the sole responsibility for any liability arising out of such ownership, operation and maintenance.

(Emphasis added).

Article VII of the Agreement explains the responsibilities of each party regarding maintenance and repair of the cable and provides:

When a break or other defect in the Cable is discovered by either party, notice shall be given promptly to the other party. LILCO will undertake, on behalf of both parties, to locate any defects in the submarine portions of the Cable and to restore service and repair or arrange for repair of any defects in the submarine portions of the Cable as promptly as possible. **The parties will share the costs of each such repair and restoration of service on the same basis as they shared the cost of constructing the Cable.**

(Emphasis added). The cost of construction of the cables was based on the *pro rata* share of the cables in each of the parties respective States. CL & P paid for 50.88 percent of the initial construction costs, and was therefore obligated to pay for that share of submarine repairs made to the cables regardless of whether the damage occurred in New York or Connecticut.

Prior to December 6, 1996, the cables had been damaged and had required maintenance and repair. This damage occurred within the boundaries of both Connecticut and New York. Pursuant to the agreement, CL & P paid its proportionate share of expenses relating to the cable, including the damages that occurred entirely within the State of New York.

CL & P and LILCO have equal rights to the use of the cables, subject to its limited capacity and the regulations of the Federal Energy Regulatory Commission ("FERC"). At the time of the occurrence, CL & P was supplying LILCO with 88 megawatts (MW) of "long term firm transmission service" under a 3 year service agreement that generated approximately $1,000,000 in revenue annually for CL & P.

As a result of "cable spill incidents," in December 1993 and January 1994, the United States Coast Guard (the "Coast Guard") conducted an investigation to determine the possible assessment of civil penalties against the cable owners. The Coast Guard requested that both LILCO and CL & P clarify the ownership of the Cable system. Both utilities stated that the portion of the cable within the boundaries of New York State was owned by LILCO and the portion within the boundaries of the State of Connecticut was owned by CL & P.

However, as stated above, CL & P and LILCO are co-insureds with respect to the cost of cable repairs and share liability regardless of the location of the repair or the occurrence. In addition, under Orders of Consent entered into with the New York State Department of Environmental Conservation and the Connecticut Department of Environmental Protection, LILCO and CL & P are jointly and severally liable for environmental harm caused by the cable, wherever the damage occurred.

## II. DISCUSSION

### A. *Summary Judgment Standard*

A court may grant summary judgment "only if the pleadings and evidentiary submissions demonstrate the absence of any genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Tasini v. New York Times Co.,* 192 F.3d 356, 360 (2d Cir.1999); *see also Hunt v. Cromartie,* 526 U.S. 541, 119 S.Ct. 1545, 1550, 143 L.Ed.2d 731 (1999) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 [1986]; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 [1986]; *Turner v. General Motors Acceptance Corp.,* 180 F.3d 451, 453 [2d Cir. 1999]; Fed.R.Civ.P. 56[c]). In this determination, the Court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the party opposing the motion. *See Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998); *Twin Laboratories, Inc. v. Weider Health & Fitness,* 900 F.2d 566, 568 (2d Cir.1990); *Tasini,* 192 F.3d at 360.

According to the Second Circuit, "[s]ummary judgment is a tool to winnow out from the trial calendar those cases whose facts predestine them to result in a directed verdict." *United National Ins. Co. v. The Tunnel, Inc.,* 988 F.2d 351, 355 (2d Cir.1993). Once a party moves for summary judgment, in order to avoid the granting of the motion, the non-movant must come forward with specific facts showing that a genuine issue for trial exists. *Fagan v. New York State Elec. & Gas Corp.,* 186 F.3d 127, 132 (2d Cir.1999); *West–Fair Elec. Contractors v. Aetna Cas. & Sur. Co.,* 78 F.3d 61, 63 (2d Cir.1996); *see also Western World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir.1990) (quoting Fed.R.Civ.P. 56[e]). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505.

However, mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. *Kulak v. City of New York,* 88 F.3d 63, 70 (2d Cir.1996). If there is evidence in the rec-

ord as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *Holt v. KMI–Continental, Inc.,* 95 F.3d 123, 129 (2d Cir.1996), *cert. denied,* 520 U.S. 1228, 117 S.Ct. 1819, 137 L.Ed.2d 1027 (1997); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991); *Grain Traders, Inc. v. Citibank, N.A.,* 160 F.3d 97, 100 (2d Cir.1998). Finally, the Court is charged with the function of "issue finding," not "issue resolution." *Gallo v. Prudential Residential Services,* 22 F.3d 1219, 1224 (2d Cir.1994).

It is within this framework that the Court addresses the present motion for summary judgment.

### B. *Maritime Law and the Robins Dry Dock decision*

Moran and Bayway argue that the Supreme Court's holding in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), bars CL & P from recovering the approximate $11 million it expended in repairing the damaged cable, and the approximate $5 million disbursed in order to prevent a voltage collapse in south west Connecticut.

Under general maritime tort law, absent evidence indicating an injury to a person or property, pure economic loss that results from a maritime tort is not recoverable even if the economic damage was a foreseeable consequence of the defendant's conduct. *Id.* at 305, 48 S.Ct. 134. In *Robins,* the seminal case in this field of the law, surprisingly consisting of only three pages, a vessel which was time chartered to the plaintiff was docked with the defendant. While the vessel was docked, its propeller was damaged as a result of the negligence of the defendant. The plaintiff sought recovery for the loss of the use of the vessel for the two weeks it was being repaired. *Robins,* 275 U.S. at 307, 48 S.Ct. 134. The plaintiff did not have a proprietary interest in the vessel. In denying recovery to the plaintiff time charterers, Justice Holmes held:

> [N]o authority need be cited to show that, as a general rule, at least, a tort to the person or property of one man does not make the tortfeasor liable to another merely because the injured person was under a contract with that other, unknown to the doer of the wrong. The law does not spread its protection so far (citations omitted).

*Id.* at 309, 48 S.Ct. 134. Based upon this holding, *Robins* has been interpreted to bar recovery to a plaintiff for purely economic damages that result from a maritime tort, as opposed to an actual or physical injury to a person or property.

A number of Circuits have adopted a "bright line" interpretation of *Robins,* finding that a plaintiff is barred from recovery for all economic loss absent physical injury to a proprietary interest. *See e.g., Getty Ref. & Mktg. Co. v. MT Fadi B,* 766 F.2d 829, 834 (3d Cir.1985); *Barber Lines A/S v. M/V Donau Maru,* 764 F.2d 50, 51 (1st Cir.1985); *Louisiana ex rel. Guste v. M/V Testbank,* 752 F.2d 1019, 1032 (5th Cir. 1985) ("[d]enying recovery for pure economic losses [absent physical injury or property damage] is a pragmatic limitation on the doctrine of foreseeability, a limitation we find to be both workable and useful.")

*Robins* and its progeny involve difficult, esoteric and often contradictory theories of damages in maritime tort law. Professors Prosser and Keaton explain the rule as follows:

> The policy against recovery based on negligence is rooted at least in part on what Professor James has called the "pragmatic" objection, that while physical harm generally has limited effects, a chain reaction occurs when economic harm is done and may produce an unending sequence of financial effects best dealt with by insurance, or by other business planning devices.

*Getty,* 766 F.2d at 832 (citing W. Prosser & W. Keaton, *The Law of Torts 1001* [5th Ed.1984] ). The rule in *Robins* attempted

to create a clear limit of liability for unintentional maritime torts. It is interesting to note, that on May 29, 1928, less than six months after the *Robins* decision, Chief Judge Cardozo in New York developed the "proximate cause" analysis which today is generally accepted as the expanded limitation on liability for negligent conduct. *See Palsgraf v. Long Island R.R. Co.*, 248 N.Y. 339, 344, 162 N.E. 99 (1928) (stating that "[t]he risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension." [citations omitted]). *See also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 268, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992).

Dissatisfied with the rigid "bright line" interpretation of *Robins*, some Circuits have permitted recovery for economic loss in the absence of physical injury to a proprietary interest, in cases of unintentional maritime torts, if the losses are sufficiently "direct" and "foreseeable." The Fourth Circuit in *Venore Transp. Co. v. M/V Struma*, 583 F.2d 708 (4th Cir.1978), allowed recovery for loss of use, by a time charterer, from the owner of a vessel that collided with its chartered vessel. *Id.* at 709.

The court reasoned that *Robins* "essentially [established] a principle of disallowance of damages because of remoteness, and because of the concern that the number of potential claims in a given instance may be staggering." *Id.* at 710. The Court found that there was nothing remote about the loss of use of a vessel resulting from a collision, regardless of whether the owner or a time charterer bore the loss. *Id.* at 711. *See also Chicago & Western Indiana R. Co. v. Motorship Buko Maru*, 505 F.2d 579 (7th Cir.1974) (finding that it is not inconsistent with *Robins* to require only that damages be "reasonably foreseeable."); *Reserve Mooring, Inc. v. American Commercial Barge Lines*, 1999 WL 1080317, * 2 (E.D.La. Nov.30, 1999) (holding that "[t]his Court likewise refuses to apply *Robins Dry Dock* and *Testbank*

blindly. In the case at bar, Defendants' barge sunk at Plaintiff's very place of business resulting in Plaintiff losing income for all the days in which the sunken barge physically prevented use of the facility. Surely, Justice Holmes himself would have held that damages to Plaintiff's business were clearly foreseeable due to Defendant's maritime tort.")

The Second Circuit's decision in *In re Kinsman Transit Co.*, 388 F.2d 821 (2d Cir.1968), has provided the impetus for the other Circuits which have departed from the "bright line" rule of *Robins*. In *Kinsman*, the defendant's negligence allowed a ship to break free from its moorings and float downstream on the Buffalo River until it collided with a bridge. *Id.* at 823. The bridge collapsed, causing an ice jam which disrupted traffic on the river for approximately two months. *Id.* The plaintiff sought recovery for the extra expense which he incurred purchasing replacement goods which could not be unloaded during the delay. *Id.* Undermining the rule enunciated in *Robins*, the Court held that:

we hesitate to accept the negligent interference with contract doctrine in the absence of satisfactory reasons for differentiating contractual rights from other interests which the law protects. The argument ... that to allow recovery in such instances would impose a penalty far out of proportion to the defendant's fault or open the field to collusive claims and increased litigation ... are answer[ed] [by the] courts ... expertise in performing their almost daily task of distinguishing the honest from the collusive or fraudulent claim.

*Id.* at 824 (quotation omitted). In *Kinsman*, the Second Circuit declined to apply the "negligent interference with contract" doctrine of *Robins*, and, instead, denied recovery because the plaintiff's injuries were too "remote" and "indirect." *Id.* at 824.

Despite the holding in *Kinsman*, the Second Circuit and other District Courts in this Circuit have subsequently reaffirm-

ed, the "bright line" interpretation of *Robins*. "Although criticized from time to time, *Robins Dry Dock* remains good law." *Allders Int'l. Ltd. v. United States*, 1995 WL 251571, * 2 (S.D.N.Y. Apr.28, 1995) *aff'd,* 100 F.3d 942, 1996 WL 19149 (2d Cir.1996). In *Federal Comm. & Navigation Co. v. The M/V Marathonian*, 528 F.2d 907 (2d Cir.1975), which like *Robins* involved a time charterer who sought recovery of loss of use of a vessel which was damaged by a third party, the Second Circuit denied recovery to the plaintiff. The Court's opinion was heavily influenced by the rationale in *Robins,* stating that in light of "the difficulty in drawing the line in a field where successive subcharters are not uncommon and rapid and wide fluctuations of rates of charter hire [are] not unknown" it could not justify a rule based on remoteness of injury. *Id.* at 908. However, it should be noted that the Second Circuit in *M/V Marathonian* did not analyze or attempt to distinguish its prior decision in *Kinsman. See also American Dredging Co. v. Plaza Petroleum Inc.*, 845 F.Supp. 91, 93 (E.D.N.Y.1993) (stating that "a purchaser of goods in a commercial transaction may not stake a claim in negligence where the jurisdiction is in admiralty and the only damages sought are for economic loss."); *Allders Int'l Ltd.,* 1995 WL 251571, * 1 – * 2 (denying recovery of economic damages, to a retail store concessionaire aboard the QE2, resulting from the cancellation of cruises after the ship was damaged).

■ In this case, CL & P seeks recovery of its proportionate share ($11,420,000) of the repair costs due to the physical damage to the cables which occurred in New York. CL & P also seeks recovery of $5,072,278 in emergency expenditures to prevent the risk of a voltage collapse in south west Connecticut. It is clear that the $11,420,000 expended by CL & P on direct repair costs to the cable does not expose MORAN and BAYWAY to liability for the "chain reaction economic harm" which Justice Holmes envisioned in his decision in *Robins*. The injury to CL & P involved direct, actual physical damage to the cables—an injury unlike that in *Robins* that only effected the plaintiff time charterers who were merely under contract to operate the vessel whose propeller was damaged. As such, even under the "bright line" interpretation of *Robins*, CL & P is entitled to seek recovery for the approximate $11 million it expended on the repair of the damaged cable.

However, if CL & P is found not to have a proprietary interest in the cable, the Court is of the view that the approximate $5 million in damages associated with the prevention of a voltage collapse in south west Connecticut, would not be recoverable as it is too remote and represents the type of economic damage loss that any interpretation of *Robins* and its progeny in this Circuit has specifically barred. Therefore, unless CL & P is found to have a proprietary interest in the cable, the rule in *Robins* will apply and bar recovery of the approximate $5 million in damages associated with the prevention of the voltage collapse.

C. *The Robins Proprietary Interest Standard*

■ Even if the Court were to have found that the "bright line" interpretation of the *Robins* decision prevented CL & P from recovering any damages as a result of the cable occurrence, the Court may still find that CL & P had a "proprietary interest" in the cables, thus circumventing the prohibition of recovery under *Robins*. A Plaintiff may recover even for purely economic loss when he has suffered physical damage to a "proprietary interest." *Testbank,* 752 F.2d at 1020. *See also Getty,* 766 F.2d at 832; *Domar Ocean Transp., Ltd. v. M/V Andrew Martin,* 754 F.2d 616, 619 (5th Cir.1985).

■ "[T]he requirements for proprietary interest are actual possession or control, responsibility for repair and responsibility for maintenance." *IMTT–Gretna v. Robert E. Lee SS,* 993 F.2d 1193, 1194 (5th

Cir.1993) (citing *Texas Eastern Trans. v. McMoRan Offshore Explor.*, 877 F.2d 1214, 1225 [5th Cir.] ); *accord Allders*, 100 F.3d 942, 1996 WL 19149. For Bayway and Moran's motion to succeed, there must be "an absence of any genuine issues of material fact" as to whether CL & P had sufficient "incidents of ownership ... that would justify recovery for damage to physical property." *Louisville & Nashville R.R. Co. v. The Tug M/V Bayou Lacombe*, 597 F.2d 469, 474 (5th Cir.1979).

 In order to have a proprietary interest actual ownership or title is not necessary. The factors to be considered in the determination of whether the plaintiff has a proprietary interest are "actual possession or control, responsibility for repair and responsibility for maintenance." *Robert E. Lee SS*, 993 F.2d at 1194. With these factors in mind, the Court finds that, at a minimum, there exists material issues of fact with regard to whether CL & P has a proprietary interest in the damaged cables. CL & P and LILCO jointly contracted to have the cable built and installed; shared the original costs of its construction; maintain a single insurance policy; are jointly liable for environmental harm that occurs anywhere along the cable; and both assumed the responsibility of co-ownership by agreeing to share all cable related repair and maintenance expenses over the life of the cable. Moreover, evidence of CL & P's proprietary interest in the cable located in New York is demonstrated by the uncontroverted fact that CL & P expended more than $11 million in repair costs to the cables when the damage was located off the coast of Long Island, New York.

As such, it is clear that material triable issue of fact exist as to whether CL & P has a proprietary interest in the damaged cables. Therefore, the Court finds that the *Robins* decision is inapplicable to the facts presently before the Court and holds that CL & P can seek recovery for both the repair costs associated with the damage to the cable, as well as the economic damages suffered as a result of the threatened voltage collapse in south west Connecticut. Accordingly, Bayway and Moran's motion for summary judgment seeking dismissal of CL & P's complaint are denied.

## III. CONCLUSION

Having reviewed the parties' submissions, and afforded them the opportunity to present oral argument, it is hereby

**ORDERED,** that Moran and Bayway's motions pursuant to Rule 56 of the Federal Rules of Civil Procedure, seeking dismissal of Connecticut Light & Power's claims are **DENIED.**

**SO ORDERED.**