Thomas H. GOSNELL, Plaintiff-Appellant,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION; South Street Seaport Museum, Defendants-Appellees.

No. 1426, Docket 91-7129.

United States Court of Appeals, Second Circuit.

Argued May 2, 1991.

Decided July 10, 1991.

Eugene VanVoorhis, Rochester (Robert J. Sant, VanVoorhis & VanVoorhis, of counsel), for plaintiff-appellant.

Christopher J. Bellotto, Counsel, Federal Deposit Ins. Corp., Washington, D.C. (Ann S. Duross, Asst. General Counsel, Colleen B. Bombardier, Sr. Counsel, Washington, D.C., Michael E. Ferdman, Hiscock & Barclay, Buffalo, N.Y., of counsel), for defendant-appellee Federal Deposit Ins. Corp.

Stewart Klein, New York City (Ogden N. Lewis, Davis, Polk & Wardwell, of counsel), for defendant-appellee South Street Seaport Museum.

Before OAKES, Chief Judge, WINTER, Circuit Judge, and CONBOY, District Judge.[*]

OAKES, Chief Judge:

This case raises an issue of considerable importance concerning the FDIC's efforts to salvage the nation's troubled banking industry. Specifically, we must decide whether an individual interested in purchasing the assets of a failed financial in-

---

[*] Honorable Kenneth Conboy of the United States District Court for the Southern District of New York, sitting by designation.

stitution may disrupt the efforts of the Federal Deposit Insurance Corporation ("FDIC") to dispose of those assets by litigating the propriety of the FDIC's actions in federal court. For the reasons set forth below, we answer this question in the negative, and therefore affirm the judgment below.

## BACKGROUND

The facts giving rise to this appeal stem from the demise of one of this nation's most venerable financial institutions, the Seamen's Bank for Savings ("Seamen's"). After Seamen's became unable to meet its financial obligations, the federal Office of Thrift Supervision placed it under receivership, and designated the FDIC to serve as receiver. The FDIC promptly arranged for the Chase Manhattan Bank to assume Seamen's liabilities, and then sold Seamen's remaining assets, including an extensive collection of maritime paintings, ship models, books and other pieces (the "Collection"), to itself in its corporate capacity.

Upon learning that the FDIC had acquired the Collection, the South Street Seaport Museum (the "Museum") expressed an interest in purchasing it. Several public officials in New York contacted the FDIC and its Chairman, William Seidman, and expressed support for transferring the Collection to the Museum. Shortly thereafter, high-level officials of the FDIC agreed to give the Museum an exclusive first opportunity to acquire the Collection, but also determined that they would not accept an offer lower than the Collection's appraised market value, approximately $3.5 million. The FDIC also sent out inventories of the Collection to all other parties who had expressed an interest in bidding.

The Museum initially offered just over $2 million for the Collection, which the FDIC promptly rejected. It therefore raised its bid to $3,412,500, the appraisal value, and sent the FDIC a certified check in the amount of $212,000 as a deposit. A liquidation specialist for the FDIC then prepared a recommendation, known as a "case," stating his belief that it would be in the best interests of the FDIC to accept the Museum's bid. Thereafter, on November 9, 1990, the FDIC agreed to sell the Collection to the Museum.

While negotiations with the FDIC were taking place, Thomas H. Gosnell learned of the FDIC's acquisition of the Collection from a magazine article. He requested information from the FDIC and, on August 17, 1990, received an inventory of the Collection. The following month, Gosnell learned through a second magazine article that the Museum would be given the exclusive opportunity to purchase the Collection. By letter dated October 9, 1990, Gosnell informed the FDIC of his interest in purchasing the Collection.

On November 5, 1990, the FDIC wrote Gosnell that it was in the "process of consummating an agreement" to sell the Collection to the Museum, and, as noted above, the FDIC accepted the Museum's bid four days later. Nonetheless, on November 19, Gosnell sent the FDIC a firm offer of $3.5 million, and two days later he forwarded an irrevocable letter of credit for the full amount of his offer. On November 21, the FDIC formally rejected Gosnell's offer and entered into a written contract with the Museum.

On December 11, 1990, Gosnell commenced this action in the United States District Court for the Western District of New York, David G. Larimer, *Judge*, seeking to enjoin consummation of the sale between the FDIC and the Museum. The crux of his complaint was that the FDIC had exceeded its statutory authority and abused its discretion by not making the Collection available on the open market for sale to the highest bidder. Gosnell also claimed that the FDIC had failed to administer its affairs fairly and impartially, in violation of section 1820(a) of the Financial Institutions Reform, Recovery and Enforcement Act of 1989 ("FIRREA"), Pub.L. No. 101–73, 103 Stat. 183 (codified in scattered sections of the U.S.C.), and that the FDIC's actions violated the Federal Property and Administrative Services Act of 1949 ("FPASA"), 40 U.S.C. § 471 *et seq.* Jurisdiction was premised on 12 U.S.C. § 1819(b)(2) and 28 U.S.C. § 1331, and on

section 702 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.* Gosnell and the defendants made cross motions for summary judgment.

In a decision and order dated February 4, 1991, the district court held that it lacked subject matter jurisdiction to resolve Gosnell's claims, and therefore granted summary judgment in favor of the defendants and dismissed the complaint. Specifically, it found that Congress intended to shield the FDIC's asset distribution decisions from judicial review, and that, even if judicial review were available, the FDIC's decisions here were not arbitrary and capricious within the meaning of 5 U.S.C. § 706(2), that they were not the product of improper political influence in violation of 12 U.S.C. § 1820(a), and that they did not violate the FPASA. Gosnell then brought this appeal.

## DISCUSSION

### 1. *FIRREA Claims*

Gosnell's contention that the FDIC exceeded its authority and abused its discretion, as well as his claim that the FDIC failed to administer its affairs fairly and impartially, all draw on principles allegedly derived from FIRREA, a recently-enacted statute setting forth the FDIC's powers in the restructuring of the banking industry. The district court concluded that Congress, in enacting FIRREA, intended to exempt from judicial review FDIC decisions regarding the disposal of assets under its control. We express no opinion on the validity of the district court's analysis in this regard. Rather, our reading of FIRREA leads us to another, more basic, reason for dismissing Gosnell's claims—specifically, that disappointed bidders such as Gosnell lack standing under FIRREA to challenge the FDIC's asset distribution decisions in federal court.[1]

■ We start with the general proposition that an individual's status as a taxpayer, taken alone, is insufficient to give him

standing to challenge the action of an administrative agency in federal court. *See Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 477, 102 S.Ct. 752, 761, 70 L.Ed.2d 700 (1982). Rather, to establish standing as a taxpayer, an individual must demonstrate that the challenged agency action is based on the Government's taxing and spending power, and, in addition, that the action is contrary to a specific constitutional limitation on the exercise of that power. *See id.* at 478–79, 102 S.Ct. at 761–62; *Flast v. Cohen*, 392 U.S. 83, 102–03, 88 S.Ct. 1942, 1953–54, 20 L.Ed.2d 947 (1968). Gosnell has not even attempted to make such a demonstration here, and it seems clear to us that he could not.

■ The more difficult question is whether Gosnell's status as a disappointed bidder for the Collection is sufficient to give him standing under FIRREA and the APA to challenge the FDIC's decision to sell the Collection to the Museum. To have standing based on his status as a disappointed bidder, Gosnell must first demonstrate that, as a result of not obtaining the collection he desired, he suffered an "injury in fact." *See Association of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 152, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970). Assuming he can demonstrate such an injury, he must further prove that disappointed bidders are "arguably within the zone of interests to be protected or regulated" by the relevant statutory scheme—here, FIRREA. *Id.* This second test "denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987).

Here, even assuming that Gosnell can meet the first test, there is no way that he could ever meet the second. Specifically,

---

1. The district court's failure to address the issue of standing does not preclude us from reaching that question ourselves. *See Fulani v. League of*

*Women Voters Educ. Fund*, 882 F.2d 621, 624 (2d Cir.1989).

we believe that allowing Gosnell to sue based on his status as a disappointed bidder would be inconsistent with FIRREA's goal of giving the FDIC broad discretion in disposing of the assets under its control. Under 12 U.S.C. § 1821(d)(2)(G)(i)(II), the FDIC as receiver may "transfer any asset or liability ... without any approval, assignment, or consent with respect to such transfer," and, under 12 U.S.C. § 1823(d)(3)(A), the FDIC enjoys this same power when acting in its corporate capacity. Gosnell, while recognizing the broad language these provisions contain, attempts to "glean[ ] from the spirit and intent of FIRREA" that the FDIC is obligated to maximize its returns through competitive bidding. Brief for Appellant at 33. Specifically, he notes that, under FIRREA, the Resolution Trust Corporation (the "RTC") is obligated to establish standards for fair and consistent treatment of bidders, see 12 U.S.C. § 1441a(a)(14) (West Supp.1990), and argues that the FDIC should therefore be controlled by the same requirements as well. In our view, however, the fact that Congress imposed these requirements on the RTC while simultaneously granting the FDIC the broad discretionary powers outlined above cuts *against* Gosnell's claim, as it suggests that Congress was aware of the advantages of competitive bidding and consciously decided not to impose this alternative on the FDIC. Accordingly, were we to allow disappointed bidders such as Gosnell to challenge the manner in which the FDIC chooses to dispose of its assets, we would undermine Congress' intent to allow the FDIC broad discretion in the disposition of its assets. *Santoni v. FDIC*, 677 F.2d 174, 179 (1st Cir.1982) (pre–FIRREA case); *cf. Diercks v. FSLIC*, 528 F.2d 916, 916 (7th Cir.1976) (per curiam) (discussing similarly broad discretion granted to the Federal Savings and Loan Insurance Corporation).

In contrast to the wide range of discretion granted the FDIC under FIRREA, those statutes under which courts have granted standing to disappointed bidders all contained specific procedural guidelines protecting the bidders' rights. For example, in *B.K. Instrument, Inc. v. United States*, 715 F.2d 713 (2d Cir.1983), we granted standing to a disappointed bidder for a defense contract where the statutes alleged to have been violated were quite "specific in their reference to bidders," and where Congress had amended one of those statutes to "give prospective bidders sufficient information to permit them to bid responsibly." *Id.* at 719; *see also Choctaw Mfg. Co., Inc. v. United States*, 761 F.2d 609, 611–12 (11th Cir.1985); *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1265–66 (5th Cir.1978).[2] In these cases, because the statutes were intended in part to protect the bidders' rights, it was reasonable to conclude that suits by disappointed bidders were consistent with the statutory scheme. *See, e.g., Scanwell Labs, Inc. v. Shaffer*, 424 F.2d 859, 864 (D.C.Cir.1970) ("When the Congress has laid down guidelines to be followed in carrying out its mandate in a specific area, there should be some procedure whereby those who are injured by the arbitrary or capricious action of a governmental agency or official in ignoring those procedures can vindicate their very real interests...."). By contrast, where, as here, an administrative statute grants an agency a wide range of discretion, courts have denied standing to persons disappointed with the manner in which the agency conducts its affairs. *See Sowell's Meats and Servs., Inc. v. McSwain*, 788 F.2d 226, 229 (4th Cir.1986) (per curiam) (noting that the grant of broad discretion to an agency "demonstrates a lack of a

---

**2.** A particularly relevant example of this type of statute is contained in *Hartigan v. Federal Home Loan Bank Bd.*, 746 F.2d 1300 (7th Cir.1984), in which the court held that an unsuccessful bidder for the acquisition of a financially troubled savings and loan institution had standing to challenge the authorization of the transfer of the institution to another party. In that case, the agency was required by statute to use prescribed procedures and priorities of consideration to assess the bids. Accordingly, because the plaintiff "was entitled to and did participate in the bid solicitation and authorization proceedings" under the statute, he was a person "deemed or admitted as a party ... in an agency proceeding" within the meaning of 5 U.S.C. § 551(3), and thus had standing to challenge the agency's action. *Id.* at 1308.

property interest or of any protected right in federal procurement procedures and indicates that judicial review of the award of a contract at the behest of a disappointed bidder is inappropriate"); *PRI Pipe Supports v. Tennessee Valley Auth.,* 494 F.Supp. 974, 976–77 (N.D.Miss.1980).[3]

Accordingly, because disappointed bidders do not fall within the zone of interests sought to be protected by FIRREA, Gosnell does not have standing under that statute to challenge the transfer of the Collection to the Museum here.

### 2. *FPASA Claim*

 Gosnell's reliance on the FPASA is not persuasive. The FPASA imposes competitive bidding requirements on government agencies only with regard to "excess" and "surplus" property. Excess property is defined as "any property under the control of any Federal agency which is not required for its needs and the discharge of its responsibilities." 40 U.S.C. § 472(e) (1988). Surplus property, in turn, is defined as "excess property not required for the needs and the discharge of the responsibilities of all Federal agencies." *Id.* § 472(g). Here, the FDIC is responsible for liquidating the assets of failed depository institutions, and the Collection, as one of those assets, is therefore "required for ... the discharge of [the FDIC's] responsibilities." Accordingly, the FDIC's decisions regarding the disposal of the Collection are not controlled by the FPASA, and Gosnell's reliance on this statute is unfounded.

The judgment of the district court is affirmed.

**3.** In addition, every case in which disappointed bidders have been granted standing involved bids for government *contracts,* not bids to buy goods from the government. This distinction is important, as a primary reason for granting standing to disappointed bidders for government contracts is that "[d]oing business with the Government has become an important part of American economic life" and that "arbitrary deprivation of government contracts on non-discretionary grounds is a serious wrong." *B.K. Instrument,* 715 F.2d at 719; *see also Choctaw,* 761 F.2d at 616. These concerns do not apply where the bids are for government assets, and the livelihood of the bidders is not dependent on the agency's decision.