**BUFFALO CENTRAL TERMINAL,**
Plaintiff,

v.

**UNITED STATES of America, Donald Eigendorff, and Lorraine Aives,**
Defendants,

Woodfield–Chapin Associates, Intervenor.

No. 90–CV–1295S.

United States District Court,
W.D. New York.

May 10, 1995.

Davis, Augello & Matteliano, Buffalo, NY, for plaintiff (Joseph A. Matteliano and Mark J. Fuzak, of counsel).

Patrick H. NeMoyer, U.S. Atty., Buffalo, NY, for defendants (Stephan J. Baczynski, of counsel).

## DECISION AND ORDER

SKRETNY, District Judge.

### INTRODUCTION

Presently before this Court are the objections of the government defendants ("defendants") and Woodfield–Chapin Associates ("intervenor") to the Report and Recommendation ("R & R") of Hon. Leslie G. Foschio, United States Magistrate Judge for the Western District of New York, recommending that this Court deny plaintiff's and defendants' motions for summary judgment and that this action proceed to trial.

On October 14, 1994, this Court entered a Referral Order referring the parties' previously filed motions for summary judgment to Magistrate Judge Foschio for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Plaintiff filed a motion for summary judgment on February 22, 1994. Defendants filed their motion for summary judgment on February 23, 1994. On January 27, 1995, Magistrate Judge Foschio filed a Report and Recommendation with respect to the parties' summary judgment motions wherein, after setting forth an analysis of the relevant legal issues, he recommended that the Court deny both plaintiff's and defendants' motions for summary judgment.

Defendants promptly objected to the magistrate judge's recommendation to deny their motion for summary judgment on February 10, 1995. Prior to this Court hearing argument on the objections, Woodfield–Chapin Associates filed a motion to intervene which

this Court granted by way of a Decision and Order read from the bench on April 11, 1995. Counsel for plaintiff, defendants, and intervenor then appeared before this Court on May 1, 1995, for oral argument on defendants' and intervenor's objections to the Report and Recommendation. As such, the Report and Recommendation and the objections thereto are now ripe for this Court's consideration.

As set forth below, upon *de novo* review, this Court will accept the Report and Recommendation of the magistrate judge.

### DISCUSSION

**A. Standard for Review of Magistrate Judge's Report and Recommendation**

Under 28 U.S.C. § 636(b)(1)(B) a district court judge may designate a magistrate judge to submit proposed findings of fact and recommendations on dispositive motions in a pending case. The district court is not bound by the recommendation of the magistrate judge, rather it may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. *Grassia v. Scully,* 892 F.2d 16, 19 (2d Cir.1989). However, the parties have an opportunity to object to the magistrate judge's proposed findings, and upon the filing of timely objections, the district judge must conduct a *de novo* review of the magistrate judge's Report and Recommendation "upon the record, or after additional evidence," but only as to those portions of the report and recommendation to which the party objects. *Id.;* Fed.R.Civ.P. 72(b); *see also Collins v. Foreman,* 729 F.2d 108, 112 (2d Cir.1984), *cert. denied,* 469 U.S. 870, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984). The district court is not required to conduct a *de novo* hearing, but must arrive at its own independent conclusion about those portions of the magistrate judge's Report and Recommendation to which the objection is made. *East River Sav. Bank v. Secretary of Housing and Urban Dev.,* 702 F.Supp. 448 (S.D.N.Y.1988). Finally, although *de novo* review requires that the district court independently consider and arrive at its own conclusions about those portions of the mag-

istrate judge's Report and Recommendation to which the objection is made, the district court need not specifically articulate all of its reasons for rejecting a party's objections. *Tuggle v. Seabold,* 806 F.2d 87, 92 (6th Cir. 1986); *United States v. Larson,* 760 F.2d 852, 857 (8th Cir.1985), *cert. denied,* 474 U.S. 849, 106 S.Ct. 143, 88 L.Ed.2d 119 (1985); *see, e.g., Niagara Mohawk Power v. Tonawanda Band,* 862 F.Supp. 995, 997–98 (W.D.N.Y.1994). It is application of these principles that guide this Court in ruling on defendants' objections to Magistrate Judge Foschio's Report and Recommendation.

**B. *De Novo Review of the Report and Recommendation***

Upon a *de novo* review of the Report and Recommendation and of the record in this case, and after reviewing the parties' respective submissions, this Court finds that Magistrate Judge Foschio's ultimate conclusion that there are factual issues which preclude the entry of complete summary judgment in favor of defendants and which must be resolved by way of trial is a correct one. Plaintiff has documented sufficient facts in the record to raise a triable issue with respect to its claim pursuant to the Administrative Procedure Act, 5 U.S.C., § 702, insofar as a reasonable inference could be drawn that the award of the IRS lease to Woodfield–Chapin Associates had no rational basis. For example, plaintiff's counsel has submitted a voluminous affidavit with citations to evidence in the record all of which suggests that there are serious and frequent flaws in the analysis that the General Service Administration performed and relied upon to support its conclusion that intervenor should receive the IRS lease. Accordingly, this Court shall adopt Magistrate Judge Foschio's proposed finding that defendants' motion for summary judgment should be denied.

■ There are only two matters raised by way of defendants' and intervenor's objections which necessitate further comment. First, intervenor and defendants argue that the only remedy available to plaintiff in this action is recovery of bid preparation costs and that this action should therefore be transferred to the Court of Claims because the cost sought to be recovered by plaintiff would exceed $10,000. *See Delta Data Systems Corp. v. Webster,* 755 F.2d 938, 940 (Fed.Cir.1985). It is argued that nullification of the contract with Woodfield–Chapin Associates is not an available remedy primarily because: (1) the contract at issue in this case is a lease; and (2) there has been significant performance under the lease. This Court finds these arguments to be without merit. First, no compelling authority or argument has been provided to support the theory that nullification is an unavailable remedy in government contract cases where the contract in question is a lease. Second, this Court finds that the case law does not support the claim that nullification is definitively unavailable as a remedy in this case because Woodfield–Chapin Associates has been performing under the lease for approximately five years. There are a host of factors which must be considered by a court in deciding whether or not the injunctive type relief of contract nullification is appropriate. *Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d 838, 846 n. 9 (1982). Admittedly, however, partial performance of a contract, in this case substantial partial performance over a five year period, is an important factor which typically leads to the denial of equitable relief to frustrated bidders. *B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 730 (2d Cir. 1983). Nevertheless, the "very serious governmental irregularities" alleged by plaintiff, if proven at trial, may be sufficient for plaintiff to meet its heavy burden to show that injunctive relief is warranted. *Keco Industries, Inc. v. Laird,* 318 F.Supp. 1361, 1364 (D.D.C.1970); *see also Gull Airborne Instruments, Inc. v. Weinberger,* 694 F.2d at 846 ([i]f ... contract has not been fully or satisfactorily performed, then injunctive relief may still be available and appropriate"); *60 Key Centre, Inc. v. Administrator of GSA,* 1994 WL 25842, *8, 1994 U.S.Dist. LEXIS 778, *22–23 (W.D.N.Y. Jan. 25, 1994) (irrational award alone is not sufficient to warrant injunctive relief, plaintiff must show "some serious departure from the appropriate standards and regulations with resulting unfairness to plaintiff"). Therefore, this Court rejects defendants' and intervenor's argument that as a matter of law the only remedy

presently available to plaintiff is the recovery of bid preparation costs.

■ Second, at oral argument defendants' counsel properly asserted that a summary judgment motion should not only be assessed in terms of whether it defeats an entire lawsuit, but should also be used by the Court to "weed out" untenable legal theories/claims and focus the issues for trial. In that regard, defendants have forcefully challenged several of the legal theories advanced by plaintiff, such as the claims pursuant to the National Historic Preservation Act of 1966, 16 U.S.C. § 470, and Executive Order 12072. Upon *de novo* review, however, this Court finds it proper to adopt the reasoning of Magistrate Judge Foschio and deny defendants' motion with respect to such claims. Nevertheless, this Court shall continue to examine these issues and following the completion of pretrial discovery, if appropriate, shall *sua sponte* raise the issue of dismissing any legal theories advanced by plaintiff which appear to be suspect. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *FLLI Moretti Cereali v. Continental Grain Co.,* 563 F.2d 563, 565 (2d Cir.1977).

In sum, having adopted the proposed findings set forth in the Report and Recommendation, this Court shall deny plaintiff's and defendants' motions for summary judgment in all respects.

### ORDER

IT HEREBY IS ORDERED, that defendants' and intervenor's objections to the Report and Recommendation are rejected and this Court shall adopt the recommended findings of Magistrate Judge Foschio.

FURTHER, that plaintiff's and defendants' motions for summary judgment are Denied in all respects.

FURTHER, that counsel shall proceed to complete the discovery desired by plaintiff as set forth in plaintiff's proposed discovery plan.

FURTHER, that all such discovery shall be complete on or before Thursday, August 31, 1995.

FURTHER, that this Court shall supervise said discovery and any objections to discovery shall be raised promptly so as to avoid the need for any extensions of time.

FURTHER, that counsel for the parties shall appear before this Court on Thursday, May 25, 1995 at 9:00 a.m. in Part IV, Mahoney State Office Building, 65 Court Street, Buffalo, New York, for a status conference.

SO ORDERED.

### REPORT AND RECOMMENDATION

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This matter was referred to the undersigned by the Hon. William M. Skretny, on October 14, 1994, for the purpose of issuing a Report and Recommendation on Plaintiff's and Defendants' motions for summary judgment, dated February 22, 1994 and February 23, 1994, respectively.

### *BACKGROUND*

Plaintiff filed its original complaint on December 19, 1990, asserting four claims for relief, alleging that Defendant United States of America, then identified as the General Services Administration ("GSA"), violated the Competition in Contracting Act of 1984 ("CICA"), 41 U.S.C. § 251 *et seq.,* 41 U.S.C. § 414, and 40 U.S.C. § 601 *et seq.,* the Public Buildings Cooperative Use Act of 1976, 40 U.S.C. § 601(a), the National Historic Preservation Act of 1966, 16 U.S.C. § 470, and Executive Order No. 12072, 3 C.F.R. 213, in awarding a lease for government space to a bidder other than Plaintiff. Plaintiff, the owner of real property known as the Buffalo Central Terminal, was an unsuccessful bidder in a government procurement process for rental space for offices of the Internal Revenue Service. In the original complaint, Plaintiff sought a preliminary injunction, however, such request was withdrawn by Plaintiff on January 9, 1991. Thereafter, Defendant GSA filed an answer on February 19, 1991.

On May 13, 1993, Plaintiff filed a First Amended Complaint, substituting the United

States of America for GSA as the named Defendant, and adding two individual Defendants, Eigendorff and Aives who were involved in the procurement process at issue in this action. Defendants filed their answer on July 8, 1993. In the amended complaint, Plaintiff asserted nine claims for relief under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702. Plaintiff is seeking an order nullifying the award of a government lease between GSA and the successful bidder, and, instead, awarding the lease to Plaintiff, or, alternatively, an order that Defendants re-open the solicitation of bids in conformity with applicable statutes and regulations, along with costs and fees to Plaintiff.

On February 22, 1994, Plaintiff filed a motion for summary judgment. On February 23, 1994, Defendant filed a cross-motion for summary judgment.

For the reasons as set forth below, Plaintiff's motion for summary judgment should be DENIED, and Defendant's cross-motion for summary judgment should also be DENIED.

### FACTS

A manual entitled *Source Selection Procedures*, dated July 21, 1987 (the "Manual") is utilized by General Services Administration ("GSA") in the procurement process as a reference guide.[1] The Manual ensures compliance with applicable laws, regulations, and procedures in the procurement process, including the Competition in Contracting Act of 1984. According to the Manual, GSA is required to "ensure that the highest degree of clarity and precision is exercised in communicating the needs (of the Government) and soliciting proposals which best satisfy those needs." *See Source Selection Procedures*, at p. 30. As such, any Solicitation for Offers ("SFO") are required to clearly state the evaluation factors, including price and other significant factors that will be considered during the procurement process. If one factor is to have predominant consideration over other factors, this information should be disclosed to the offerors. *See Source Selection Procedures*, at p. 31. The same criteria are set forth in a GSA procedure manual entitled *Acquisition of Leasehold Interests in Real Property* ("Acquisition Guidelines"), dated June 22, 1981. In addition, only those factors listed in an SFO may be considered in the procurement process when evaluating offerors' proposals. *See Acquisition Guidelines*, at p. 15. However, Julie Karson, in-house counsel for GSA has indicated that the leasing handbook is "mostly outdated." *See* Affidavit in Response to Affidavit in Support of Plaintiff's Motion for Summary Judgment, dated December 9, 1994, at p. 2, ¶ 5.

In the fall of 1988, the Internal Revenue Service ("IRS") submitted a request to GSA for approximately 65,000 square feet of office space in the Western New York area. The IRS indicated to GSA that its request for space should be located within a delineated area of Western New York which included the City of Buffalo, and portions of the Towns of Cheektowaga, West Seneca, and Tonawanda, all three adjacent suburbs of Buffalo.[2] Thereafter, in June, 1989, GSA placed an advertisement in the "Buffalo News," the Buffalo, New York newspaper, indicating that the IRS was planning to relocate its Taxpayer Assistance Service Unit of the Buffalo District Office, which serviced toll-free calls from taxpayers in the Northeast United States, and that it was seeking approximately 65,000 square feet of office space for that purpose.

Upon learning of the proposal, Plaintiff became interested in bidding for the lease for office space, and informed GSA, specifically, James Nemeti, a contracting officer, of its interest. Thereafter, Plaintiff acquired an

---

1. The sources for the fact statement include the First Amended Complaint, along with the relevant papers filed by Plaintiff and Defendants in support of their respect motions for summary judgment, including the Statements of Undisputed Facts.

2. The delineated area within which the GSA ultimately solicited prospective lessors was bounded on the north by Interstate 290, on the south by Interstate 190, on the east by Interstate 90, and on the west by Interstate 190. The eastern boundary was also extended to include that portion of Cheektowaga and West Seneca located between Interstate 90 and the east side of Union Road, bordered on the north by Wehrle Drive in Cheektowaga, and on the south by Seneca Street and Ridge Road in Buffalo and West Seneca.

option to purchase the former New York Central Railroad Terminal (the "Terminal"), located within the City of Buffalo, which had previously been used as both an office building and a train terminal. The Terminal property consisted of approximately sixteen acres, with two adjacent buildings, including a fourteen-story office tower and main concourse and an adjacent five-story office building. The Terminal has been listed in the National Register of Historic Places.

In October, 1989, two other individuals, William Scolnik and Vincent DiNapoli, approached GSA, through Defendant Aives, regarding their interest in bidding on the IRS lease. Both individuals had previously negotiated with GSA for approximately twenty other lease agreements, including three lease agreements with the IRS. Although, as of October, 1989, neither Scolnik nor DiNapoli owned any real property in the Buffalo area suitable for the IRS lease, on November 16, 1989, Scolnik, DiNapoli, and a realtor, met with Aives in order to survey potential sites for the IRS lease which Scolnik and DiNapoli would consider for purchase. One of the sites which the parties toured on that day was the Terminal tower building, even though Plaintiff had already acquired an option to purchase the property, and, therefore, it was unavailable for purchase by Scolnik or DiNapoli. According to Plaintiff, GSA informed Scolnik and DiNapoli at that time that it was not in favor of utilizing the Terminal property for the IRS lease. However, this fact was not communicated to Plaintiff, despite the fact that Plaintiff had already communicated its interest to GSA in using the Terminal building for its offer.

On the same day, Scolnik, DiNapoli, Aives, and the realtor also toured another property, known as the Appletree Mall, located in Cheektowaga, New York. According to Plaintiff, GSA became interested in that location, causing Scolnik and DiNapoli to immediately acquire an option to purchase the Appletree Mall.

On December 1, 1989, GSA issued an SFO for the IRS lease. The SFO provided all potential offerors with specific detailed information regarding GSA's requirements for the lease. The technical award factors established by GSA for this SFO, other than price, in descending order of importance, included physical characteristics of the property, such as character and quality of space, grounds, and approaches, landscaping, and decor of the main lobby; layout, compatibility with intended use, and consistency of development with state, regional, and local plans; time frame of delivery of space, public transportation facilities within one half mile of the property; and, eating facilities within one half mile of the property. *See* Plaintiff's Exhibit 1, at p. 6.

Following issuance of the SFO, negotiation objectives for the IRS lease were developed by Defendant Lorraine Aives, and by Richard Favuzzi, a realty specialist. *See* Plaintiff's Exhibit 7B. These objectives established that GSA was seeking a location which conformed with the stated criteria in the SFO, that was responsive to the outlined award factors, that had the lowest possible reasonable base cost of services, and that had the lowest possible fair and reasonable rental rate, in consideration of a market range of between $21.75 and $26.75 per net usable square foot for fully serviced office space. *See* Plaintiff's Exhibit 7B. According to Aives, however, negotiation objectives were not usually in writing prior to the date of the actual lease award, but, rather, were placed in the file before the lease was signed by the government so that anyone who examined the file could see what the contracting officer's objectives were. *See* Plaintiff's Exhibit 8C, Deposition of Lorraine Aives, at p. 112.

The award factor evaluation criteria was developed by Defendant Donald Eigendorff, with input from Richard Favuzzi, although the date it was authored is unclear, being sometime before or after May 1, 1990. *See* Plaintiff's Exhibit 2B, at p. 200, 203. The award factor evaluation criteria set forth the scores, from 1 (poor) to 5 (excellent), with which each award factor, as stated above, was evaluated. For example, it stated that, as to layout compatibility and local plans, that buildings providing space on a single floor plan would receive an excellent rating for that criteria, whereas a plan which provided for space on four floors would receive a poor rating. *See* Plaintiff's Exhibit 7A. The

SFO also indicated that price was of equal importance to the combined score of the technical award factors. *See* Plaintiff's Exhibit 1, at p. 6. The physical characteristics and quality factor accounted for thirty percent of the technical award factors score, and the layout and compatability factor accounted for twenty-five percent of the technical award factors score. The delivery of space factor was weighted at twenty percent of the total technical score, transportation at fifteen percent, and eating facilities at ten percent.

Following the issuance of the SFO, many initial bid proposals were received by GSA. One offer was submitted by Scolnik and DiNapoli, on December 18, 1989, offering the space on two floors of the Appletree Mall. *See* Plaintiff's Exhibit 12B, at p. 464. According to Plaintiff, Scolnik and DiNapoli were thereafter advised by GSA that a one-floor plan was preferable, although that preference was not made a part of the written solicitation for offers, and Plaintiff, submitting an offer using multiple floors, was unaware of that preference, having never been informed. Eigendorff, however, at his deposition, stated that, as four floors was the maximum allowable, while not stated, it was "implicit" in the SFO that less than four floors would be preferable. *See* Plaintiff's Exhibit 12B, at p. 240–241.

Plaintiff submitted its offer for the IRS lease on January 18, 1990, offering the space in the five-story building at the Terminal to GSA, utilizing four out of the five floors of the building. Meanwhile, Scolnik and DiNapoli, in the form of a general partnership known as Woodfield Chapin Associates ("WCA"), submitted a revised offer of the space at the Appletree Mall, utilizing a one-floor format. Plaintiff's bid, the WCA bid, and two other bids, one from Uniland Development Company, and one from Benderson Development Company, both local developers, also for space located in suburbs of Buffalo, were ultimately considered to be responsive to the minimum requirements of the SFO, meriting further negotiation and consideration. According to Plaintiff, the initial offer from WCA was the highest bid as to price.

Commencing in January, 1990, negotiations began between the WCA principals and representatives of GSA and the IRS. GSA also negotiated with Plaintiff, although representatives from the IRS were not present at those meetings. However, according to Plaintiff, although disputed by Defendants, during January, 1990, despite ongoing negotiations with at least two offerors, the IRS commenced preparations for relocation to the Appletree Mall facility, and had a floor-plan layout of the site prepared. Further, there was evidence that the Chief of the Space and Acquisition Staff of the IRS, Ronald Dukarm, considered two key sites for the lease to be either the Appletree Mall, or the former Goldome building at Main and Eggert Roads, in Amherst, New York, and requested that he be informed when offers for those locations were submitted. *See* Plaintiff's Exhibit 39. The talk among IRS staff regarding these two locations caused Dukarm to later remark that such discussions showed a "pre-selection for a $20 million contract," and that any public discussions regarding the lease procurement would be a "breech (sic) of disclosure," and should not be continued. *See* Plaintiff's Exhibit 40.

Following negotiations between the four offerors and GSA, best and final offers were required to be submitted to GSA by March 30, 1990. *See* Plaintiff's Exhibit 25B at 82. Prior to the lease award, an award factor evaluation was conducted by Eigendorff and Favuzzi. *See* Plaintiff's Exhibit 10B, at p. 99. The evaluation was made from the offers, negotiation records, verbal discussions with the contracting offerors, and other documents, such as market surveys, along with conversations from some of the various building managers. *See* Plaintiff's Exhibit 10B, at p. 100–101, Exhibit 12B, at p. 229. Out of the four final offers, WCA and the Appletree Mall placed first, scoring 470 out of 500 possible points, while Plaintiff's scores placed the Terminal in last place, scoring 300 out of 500 possible points. *See* Plaintiff's Exhibit 9. Plaintiff, while not achieving a top score of "5" in any category, fared the worst in the category of "Layout," scoring a "1" or "poor" rating. Favuzzi acknowledged that, in evaluating the offers, it was the conclusion of the contracting officials that a one-floor open of-

fice layout was best suited for the IRS lease. *See* Plaintiff's Exhibit 10B, at p. 162. According to Plaintiff, the factor relating to layout, compatibility, and local plans, despite being weighted at twenty-five percent of the total technical score, was deemed, during the evaluation, to be the most important and controlling factor in the procurement, other than price, with the emphasis in the layout evaluation to be on a single-floor layout. *See* Affidavit of Mark J. Fuzak, dated February 22, 1994, at p. 26, ¶ 39. According to Plaintiff, except for WCA, the other offerors were unaware of the predominance of this factor, in violation of the procurement process policies, as the initial solicitation indicated that, as to floor space, the space was to be located on no more than four floor that were contiguous, with at least two of the four floors having a minimum of 20,000 usable square feet. *See* Affidavit of Mark J. Fuzak, at p. 26–28, ¶¶ 39–40. *See also* Plaintiff's Exhibit A, "Unique Requirements." As to the other technical factors, the award factor evaluation revealed that GSA did not believe that Plaintiff could deliver the Terminal ready for use within 120 days. *See* Plaintiff's Exhibit 9. Further, as to transportation and eating facilities, Plaintiff scored lower on these factors, allegedly based on GSA's erroneous belief that the Terminal building was positioned on an incline, causing hardship for any handicapped employees. *See* Plaintiff's Exhibit 9. However, as evidenced later, Eigendorff admitted that the Terminal building being offered for use was not located on an incline. *See* Plaintiff's Exhibit 18B, at p. 410–411.

As to price, WCA's initial best and final offer was approximately $500,000 per year higher than that of Plaintiff, and, according to Plaintiff, was also beyond the competitive range and market survey price range. *See* Affidavit of Mark J. Fuzak, Esq., at p. 60, ¶ 82; Plaintiff's Exhibit 30C, at p. 229. Defendant Eigendorff, on April 6, 1990, reopened negotiations. *See* Plaintiff's Exhibit 23B at p. 359. Defendant, however, states that Aives and WCA did not conduct extensive negotiations after March 30, 1990. *See* Response to Plaintiff's Statement of Undisputed Facts, dated December 9, 1994, at p. 3, ¶ 10. Nonetheless, WCA thereafter submitted a second best and final offer on April 23, 1990, which remained higher than Plaintiff's offer by approximately $130,000 per year in direct rental payments, plus extra costs of services and utilities. *See* Affidavit of Mark J. Fuzak, at p. 68, ¶ 94. Notwithstanding the higher price associated with the WCA offer, GSA, after consideration of all of the relevant factors, on May 1, 1990, recommended to the IRS that the lease be awarded to WCA. On May 2, 1990, the IRS accepted the GSA recommendation, and, on August 29, 1990, the lease was awarded to WCA.

■ Prior to the signing of the lease, WCA encountered difficulty in obtaining financing to exercise its option on the Appletree Mall, and to commence and complete the required reconstruction necessary for the IRS lease. The GSA's Credit and Finance division determined that WCA had unsatisfactory financial capability. *See* Plaintiff's Exhibit 27. However, Eigendorff interceded with the GSA Credit and Finance division, sending further information and asking for a reevaluation.[3] *See* Plaintiff's Exhibit 27, Letter to Mr. Clay Gergick, dated July 2, 1990. The lease award was thereafter offered to WCA on the conditions that it provide evidence that WCA had extended their option to purchase the Appletree Mall, and that it provide an irrevocable letter of credit in the amount of $100,000 to the Government. *See* Plaintiff's Exhibit 27, Letter to Mr. Willard Scolnik, dated July 13, 1990. The lease award was for a period of ten years, with a five year option to renew, and the lease was worth approximately $26,000,000. In August, 1990, Jay Kaiser, a real estate developer in Stamford, Connecticut, who owned the Appletree Mall, joined WCA as a partner, through his company, Amcap, Inc., and contributed the land under which the Appletree Mall was located as an asset. *See* Plaintiff's Exhibit 28A, Affidavit of Jay Kaiser, dated March 4, 1992, at p. 4, ¶ 15. Further, Kaiser, the managing partner of Comal Associates, the owner of the building and improvements

---

3. Under 48 C.F.R. § 509.106–70, the opinion of the Credit and Finance Branch is advisory, and the decision to accept or reject its opinion is solely within the discretion of the contracting officer.

of the Appletree Mall, sublet the space required by GSA to WCA to enable WCA to perform the lease. *See* Affidavit of Jay Kaiser, at p. 4, ¶ 15.

Plaintiff, upon learning of the lease award to WCA, filed a protest of the award with the General Accounting Office ("GAO") on the grounds that GSA had conducted a biased and predetermined award process, that WCA was not qualified to receive the award, that GSA violated Executive Order No. 12072 by not obtaining space within the City of Buffalo, and that GSA failed to provide Plaintiff with the historic preference. The protest was unsuccessful. On December 19, 1990, prior to the decision from the GAO, Plaintiff commenced this action. The GAO ultimately upheld the agency's lease award to WCA, by decision dated, January 29, 1991.

## DISCUSSION

### 1. *Remedies*

In this case, both parties have moved for summary judgment. However, as Plaintiff is seeking a remedy whereby this court would nullify the award of the lease to WCA and award the IRS lease to Plaintiff, both parties have suggested that the court make an initial determination as to its general authority to fashion such a remedy, prior to a decision on the merits of the summary judgment motion, although Plaintiff requested an "informal," advisory opinion, while the Government seeks a final determination of this issue, with further briefing on the merits, if necessary.

While the Government agrees that the court has the inherent authority to set aside a government contract and to award the contract to a competitor, the Government asserts that the court's authority to award such a remedy is not "unbridled." *See* Letter from Government, dated March 4, 1994, at p. 2. The Government contends that award of a contract to a disappointed bidder may occur "only in those instances where there is irrefutable proof that but for the illegality the plaintiff would have been awarded the contract." *See* Letter from Government, dated March 4, 1994, at p. 2. Plaintiff, however, argues that Defendant should be ordered to disqualify WCA, and to award the lease to Plaintiff based on the controlling law. Defendant contends that, even if there were illegalities in the procurement process relative to the IRS lease, Plaintiff should not be entitled to a setting aside of the lease award as the balancing of the equities establishes that it would be more disruptive to the public interest to disturb the present lease, and that, to the extent it has suffered any harm as a result of procurement violations in this leasing action, Plaintiff's only practical remedy would be the recovery of bid preparation costs. *See* Letter from Government, dated March 4, 1994, at p. 2.

Disappointed bidders for government contracts are permitted to seek judicial review of the agency action denying them the contract under 5 U.S.C. § 702 of the Administrative Procedures Act ("APA"). *See B.K. Instrument, Inc. v. United States,* 715 F.2d 713, 720 (2d Cir.1983) (Friendly, J.). The remedies used by the General Accounting Office include immediately recompeting the contract, issuing a new solicitation, terminating the contract, and/or implementing other recommendations as necessary to promote compliance with procurement statutes and regulations. 31 U.S.C. § 3554(b)(1). While a district court is not specifically empowered to exercise this range of options, these remedies reflect the type of remedies which have been used by the courts. *Action Service Corp. v. Garrett,* 790 F.Supp. 1188, 1196 (D. Puerto Rico 1992). Various equitable remedies have been fashioned by the courts upon a finding that there were illegalities in the procurement process, including awarding the contract to the next lowest responsive bidder, *see Action Service Corp. v. Garrett, supra,* at 1197, and remanding the contract back to the federal agency for a factual determination. *See Mark Dunning Industries, Inc. v. Cheney,* 726 F.Supp. 810 (M.D.Ala.1989), *aff'd,* 934 F.2d 266 (11th Cir.1991). When directing an agency to award a contract to the next, lowest responsive bidder, the court is simply undoing the illegal actions of the agency, and instructing the agency to proceed with the procurement process. *Ulstein Maritime, Ltd. v. United States,* 833 F.2d 1052, 1058 (1st Cir.1987).

 The court's analysis of the case-law establishes that, if the procurement process is found to be invalid or illegal, one remedy would be to nullify the award, and to reopen the solicitation for the lease award. Another remedy would be to award the contract to the next lowest, responsive bidder, which, in this case, could possibly be Plaintiff, after a reevaluation of the factors, but could also be one of the two other offerors, Uniland or Benderson. A court may order that a contract be awarded to a specific party when "it is clear that, but for the illegal behavior of the agency, the contract would have been awarded to the party asking the court to order the award." *Delta Data Systems Corp. v. Webster*, 744 F.2d 197, 204 (D.C.Cir.1984). It is also well established that "the ultimate grant of a government contract must be left to the discretion of the government agency." *Id.*

 In this case, four offerors competed for the award of the IRS lease. After an analysis of the award factors, WCA was deemed to be the most responsive bidder, and was awarded the lease, while Plaintiff was deemed to be the least responsive offeror. The court finds that, even if WCA were to be disqualified on the basis that the lease award was illegal and invalid, it is not clear that Plaintiff would automatically be entitled to the lease award. Rather, the case law suggests that, following an evaluation in accordance with the relevant statutes and regulations, the next lowest responsive bidder would be entitled to the award. The fact that neither Uniland nor Benderson has joined the litigation does not change this result, as nothing in the case law suggests that these parties would be automatically disqualified because of their decision not to sue. *See Ulstein Maritime, Ltd., supra*, at 1058 (court stated that it was "important to note that the order of the district court [was] not an order directing the [defendant] to award the contract to a specific plaintiff" where appellees were the third and fourth lowest bidders on the contract, as it was possible that the second lowest bidder would be awarded the contract).

Accordingly, the court concludes that, while it has the authority to nullify the award

of the IRS lease to WCA, it would not award the lease to Plaintiff unless the Plaintiff had first established material illegalities in the procurement process involving the IRS lease, and then was found to be the next lowest responsive bidder.

However, Defendant also asserts that it is clear that recovery of bid preparation costs only are a legitimate remedy to an aggrieved unsuccessful bidder. *See Delta Data Systems Corp. v. Webster*, 755 F.2d 938 (D.C.C. 1985); *B.K. Instrument, Inc. v. United States, supra.* In *Delta Data Systems, supra*, the court held that, where the government had already been proceeding under its contract with the successful bidder for a year, it was inappropriate to interrupt the contract, but, rather, the plaintiff should pursue its remedy under the Tucker Act, 28 U.S.C. § 1491, for bid preparation costs. *Delta Data Systems Corp., supra*, at 939–940. In *B.K. Instrument, Inc., supra*, the court stated that, if the court should rule in the plaintiff's favor on the merits, but should decide that dismissal of the claims for declaratory or injunctive relief was required because of equitable factors, such as partial performance of the contract, it should allow recovery to the plaintiff for its bid preparation costs only. *B.K. Instrument, Inc., supra*, at 730–32.

 In this case, the contract with WCA has been proceeding since January, 1991, a period of almost four years. Therefore, while, as noted above, the court may legitimately nullify a contract which has been procured based on illegal factors, equitable factors present in this case may result in the plaintiff being permitted a remedy as to recovery of bid preparation costs only. *See B.K. Instrument, Inc., supra*, at 730 (courts have "considered partial performance of a contract to be an important factor in the denial of equitable relief to frustrated bidders") (citing *Keco Industries, Inc. v. Laird*, 318 F.Supp. 1361, 1364 (D.D.C.1970) (given partial performance of a contract, "only very serious government irregularities will support injunctive relief")).

Accordingly, these remedies are all available to the court if Plaintiff is ultimately successful. While, as discussed below, the

court is recommending that both Plaintiff's and Defendants' motions for summary judgment be denied, and that, if and when judgment is entered for Plaintiff, it will be up to the district judge to fashion appropriate relief, *see Latecoere International, Inc. v. United States of America Department of the Navy,* 19 F.3d 1342, 1366 (11th Cir.1994), the court notes that, if it is found that the lease award was predetermined in bad faith, thus going to the integrity of the bidding process and the important public policies implicated in the alleged violations, the district court should not hesitate to nullify the lease award to WCA, and either rebid the entire lease, or award it to the next responsive bidder.

## 2. *Bid Process for IRS Lease*

### a. *Standing*

 A plaintiff has standing to challenge an agency action as illegal under the Administrative Procedure Act ("APA") if the agency's decision has resulted in injury to the plaintiff, and if the plaintiff is within the "zone of interests" protected by the statute, executive order, or regulation which the agency is alleged to have violated. *See Clarke v. Securities Industry Association,* 479 U.S. 388, 395, 107 S.Ct. 750, 755, 93 L.Ed.2d 757 (1987). Therefore, to have standing based on its status as a disappointed bidder, Plaintiff must first demonstrate that, as a result of not obtaining the lease award, it suffered an "injury in fact." *Gosnell v. Federal Deposit Insurance Corporation,* 938 F.2d 372, 375 (2d Cir.1991). If Plaintiff can establish such an injury, it must further prove that it is "arguably within the zone of interests to be protected or regulated by the relevant statutory scheme." *Gosnell, supra* at 375. This second test "denies a right of review if a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Gosnell, supra,* at 375 (citing *Clarke, supra,* at 397, 107 S.Ct. at 756). Those statutes under which courts have granted standing to disappointed bidders all contain specific procedural guidelines protecting the bidders' rights. *Gosnell, supra,* at 376. However, disappointed bidders

have also been granted standing in instances where the bids involved government contracts, as a primary reason for granting standing to disappointed bidders for government contracts is that "doing business with the Government has become an important part of American economic life" and that "arbitrary deprivation of government contracts on non-discretionary grounds is a serious wrong." *Gosnell, supra,* at 377 n. 3 (citing *B.K. Instrument, Inc. v. United States, supra,* at 719).

Defendants argue that Plaintiff is relying upon the provisions of Executive Order 12072, Temporary Reg. D–73 of the Federal Property Management Regulations, which implements the policy established in Executive Order 12072, and the National Historic Preservation Act to constitute "relevant statutes" giving rise to standing under the APA, and that these provisions cannot serve as the basis for obtaining APA review. Plaintiff contends that "there are numerous cases upholding the right to seek judicial relief as a result of a biased, predisposed, subjective and unlawful procurement process," and that, as such, Plaintiff clearly has standing to dispute the lease award. *See* Plaintiff's Response Memorandum, dated December 9, 1994, at p. 3. The court agrees.

In *Scanwell Laboratories, Inc. v. Shaffer,* 424 F.2d 859 (D.C.Cir.1970) (Tamm, J.), the court stated that:

> The public interest in preventing the granting of contracts through arbitrary or capricious action can properly be vindicated through a suit brought by one who suffers injury as a result of the illegal activity, but the suit itself is brought in the public interest by one acting essentially as a "private attorney general."

*Scanwell, supra,* at 864.

The court in *Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir.), *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973), in holding that the plaintiff, as a landlord and an unsuccessful bidder, had standing to seek judicial review of a government contract award, stated that a bidder who has suffered sufficient injury in fact may, in pursuit of a vindication of that injury, assert not only his own rights,

but those of the public. *Merriam, supra,* at 1240.

Plaintiff has sufficiently alleged, for purposes of showing standing, that it suffered an injury when it unsuccessfully bid for the government lease award. In addition, while the regulations cited by Plaintiff do not contain specific procedural guidelines for protecting a bidders' rights, the court finds that Plaintiff's rights fall within the zone of interests protected by these regulations. The Terminal property for which Plaintiff sought to obtain a lease for office space was undisputably on the National Register of Historic Places, and was within the City of Buffalo limits, an urban area that would be covered under Executive Order 12072. Further, these regulations have previously been held sufficient to establish standing to sue under the APA. *See, e.g., Jane D. v. Social Security Administration,* 1987 WL 25625 (E.D.La.1987) (holding that a plaintiff had standing to enforce Executive Order 12072 in a suit under the APA); *Save the Courthouse Committee v. Lynn,* 408 F.Supp. 1323, 1332 (S.D.N.Y.1975) (holding that plaintiff had standing to bring suit as complaint allegations supported a finding of "injury in fact," and that the interest sought to be protected was clearly within the zone of interests sought to be protected by the statutes invoked, including the National Historic Preservation Act).

Accordingly, based on the above, the court finds that Plaintiff has standing to bring this action against Defendant.

### 3. *Review of the Agency Action*

Summary judgment will be granted pursuant to Fed.R.Civ.P. 56 when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 331, 106 S.Ct. 2548, 2556, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn,* 930 F.2d 204, 209 (2d Cir.1991). The party moving for summary judgment bears the burden of establishing the nonexistence of a genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Celotex, supra,* at 331, 106 S.Ct. at 2556.

The function of a district court in considering a summary judgment motion is not to resolve disputed issues of fact, but to determine whether there is a genuine issue to be tried. *Rattner, supra,* at 209. In assessing the record, including any affidavits, exhibits, and other submissions, the court is required to resolve all ambiguities and to draw all factual inferences in favor of the nonmoving party. *Anderson, supra,* at 255, 106 S.Ct. at 2513; *Rattner, supra,* at 209.

As noted above, disappointed bidders for government contracts are allowed to seek judicial review of the agency action under 5 U.S.C. § 702 of the Administrative Procedure Act ("APA"). "This review is encouraged both to provide equitable relief for bidders should any violations of the federal procurement process occur, *citations omitted,* and to protect the public interest in the procurement process which is best represented by disappointed bidders who have both a knowledge of and investment in the proper functioning of the procurement process." *Action Service Corp. v. Garrett, supra,* at 1193. The standard of review in the judicial determination relative to a government contract is whether the award of the contract was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This standard requires that "a disappointed bidder must show either (1) that the decision of the procurement official had no rational basis, or (2) that the decision involved a clear and prejudicial violation of applicable statutes or regulations." *Choctaw Manufacturing Co. v. United States,* 761 F.2d 609, 616 (11th Cir. 1985). In applying the standard, the court is required to base its review on the administrative record that was before the agency at the time of its decision. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 825, 28 L.Ed.2d 136 (1971). One exception to this rule is that the court is permitted to go outside of the administrative

record to consider background evidence to clarify the information before the agency at the time of its decision. *City of Reading, Pa. v. Austin,* 816 F.Supp. 351, 361 (E.D.Pa. 1993). Further, "in instances in which an administrative record appears adequately to explain an agency decision, but in which a plaintiff specifically alleges bad faith on the part of agency officials and provides a reasonable factual basis for such an allegation, discovery of more than the administrative record is permissible and appropriate if limited to the bad-faith allegation." *Applications Research Corp. v. Naval Air Development Center,* 752 F.Supp. 660, 667 (E.D.Pa.1990) (citing *Overton Park, supra,* at 420, 91 S.Ct. at 825). The burdens of proof under Rule 56 are fully applicable when a party moves for summary judgment in a suit brought under Section 702 of the APA, with the burden on the party seeking review under Section 702 to set forth specific facts showing that he has been adversely affected or aggrieved by agency action within the meaning of a relevant statute. *Lujan v. National Wildlife Federation,* 497 U.S. 871, 884, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990).

■ Plaintiff raises four points in contending that the procurement process in this case was illegal. First, Plaintiff argues that GSA conducted a biased, subjective predetermined award process that was in bad faith. It is clear that bad faith in the procurement process includes predetermining the awardee. *Latecoere International, Inc. v. United States of America Department of the Navy, supra,* at 1356. Second, Plaintiff asserts that WCA had a lack of procurement integrity and contractor responsibility, making them ineligible for the award. Plaintiff sets forth two factors relating to relevant statutes which should have resulted in the award of the lease to Plaintiff: (1) the fact that Plaintiff's property, located in the City of Buffalo, was not provided with the preference it should have been accorded under Executive Order 12072 and Temporary Regulation D–73 of the Federal Property Management Regulations, and (2) the fact that Plaintiff was not provided with credit for its historic preference under the National Historic Preservation Act.

Executive Order 12072 expressly provides that:

> Federal facilities and Federal use of space in urban areas shall serve to strengthen the Nation's cities and to make them attractive places to live and work. Such Federal space shall conserve existing urban resources and encourage the development and redevelopment of cities.

Executive Order No. 12072 § 1–101, 43 Fed. Reg. 36869 (August 16, 1978).

According to President Carter, this order was intended "to move jobs and people and opportunities and growth down to the formerly abandoned central city areas of those that were being abandoned in a slow and inexorable way." 14 Weekly Compilation of Presidential Documents 1427, 1428 (August 16, 1978). In implementing this order, the initial regulations provided that:

> First consideration shall be given to a centralized business area and adjacent areas of similar character in the central city of Standard Metropolitan Statistical Areas (SMSA) defined by the Department of Commerce publication (Government Printing Office Stock Number 041–001–00101–8), including other specific areas of a city recommended by the elected chief executive officer of the local government or a designess, except where this type of consideration is otherwise prohibited.

41 C.F.R. § 101–17.002(c)(1) (1987).

In 1987, Temporary Regulation D–73 was promulgated which provided that:

> In the policy and plan development process, first consideration shall be given to rural areas, central business areas and other redevelopment areas if the location is contained within an agency's geographical requirements. Plans shall comply with all applicable statutes and Executive Orders.

Temporary Regulation D–73, 41 C.F.R. § 101–17.205(b).

■ In addition, the National Historic Preservation Act, 16 U.S.C. § 470, requires that an agency give preference to a historical building when selecting space for government facilities.

Plaintiff alleges that these statutes and regulations were not followed by Defendants during the procurement process for the IRS lease award, and that, indeed, Defendants, in bad faith, preselected the successful bidder, making the entire procurement process a sham. Defendants, however, argue that they rationally determined that Plaintiff did not meet the terms and conditions of either the solicitation or the offer from WCA, and that, therefore, Plaintiff was not entitled to statutory and regulatory preferences. Plaintiff also argues, although highly disputed by Defendants, that WCA was not a qualified bidder, and should, therefore, have not been awarded the lease.

 The court finds that, while extensive discovery has been completed, and Plaintiff and Defendants do agree on certain issues contained in the administrative record, there remain several key disputed issues which go to the determination of whether there was bad faith during the procurement process.

According to the administrative record, WCA submitted its first offer in December, 1989, while Plaintiff submitted its offer in January, 1990. However, Plaintiff contends that WCA was negotiating with Defendants during this period, and that when WCA learned that Defendants preferred a floorplan layout using only one floor, it resubmitted its offer using this preference, while Plaintiff, not having the benefit of knowing Defendants' preferences, submitted a floorplan using four floors. While the administrative record does not show that negotiations with WCA were ongoing where WCA might have learned of this preference, there is an inference that WCA had knowledge of the preference which the other offerors did not. In addition, although disputed by Defendants, there is evidence that, as early as January, 1990, the IRS began preparing floorplans using the Appletree Mall site, with IRS officials cautioning against discussing the site publicly for fear of showing any predisposition. Plaintiff also raises the issue that officials within the IRS were predisposed to the Appletree Mall site, specifically delineating the Union Road area in Cheektowaga where the Appletree Mall was located to be included within the area where the site would be chosen from.

Plaintiff and Defendants also dispute the issue as to whether, during negotiations and evaluation, Eigendorff actually evaluated the wrong building located on the Terminal site, erroneously deducting points from Plaintiff's score on the belief that the building was located on an incline when it actually was not. Plaintiff also disputes Defendants' assertion that numerous eating facilities existed within the Appletree Mall, and that sufficient public transportation was available to and from the Appletree Mall, showing that only one bus route was available, and that only one eating facility was open within the Appletree Mall during working hours.

Finally, Plaintiff points out the fact that Eigendorff interceded on behalf of WCA when WCA was given an unqualified financial rating prior to the lease award being made final. In addition, Plaintiff allege, and have submitted supporting documents, to show that, even though WCA added a third partner in order to obtain satisfactory financing to complete its obligations and to obtain the IRS lease, WCA did not disclose this fact to Defendants, and continued to represent itself to be a small business entity.

 The court finds that these disputed facts raise the issue of bad faith on the party of agency personnel, which must be resolved through an assessment of credibility. Credibility determinations, weighting of evidence, and drawing of inferences from underlying facts are functions not to be performed by a judge on a summary judgment motion. *Applications Research Corp. v. Naval Air Development Center, supra,* at 665 (APA action by disappointed bidder for government contract). *See also Anderson v. Liberty Lobby, Inc., supra,* at 255, 106 S.Ct. at 2513 (summary judgment not the appropriate method for resolving issues of witness credibility). While the standard of review under the APA is limited, Plaintiff's case revolves around the issue of bad faith, and the court finds that, based on the disputed evidence before the court, the issue cannot be resolved on summary judgment.

Therefore, Plaintiff's motion for summary judgment and Defendants' cross-motion for

summary judgment should be DENIED, and a trial on the merits of this action should proceed accordingly.

### CONCLUSION

Based on the discussion above, Plaintiff's motion for summary judgment should be DENIED, and Defendants' cross-motion for summary judgment should be DENIED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of receipt of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 30(a).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

SO ORDERED.

DATED: January 27th, 1995.